ANTHONY THEOPHILOS AND PATRICIA A. THEOPHILOS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Theophilos v. Commissioner
Docket No. 8450-91
United States Tax Court
T.C. Memo 1994-45; 1994 Tax Ct. Memo LEXIS 47; 67 T.C.M. (CCH) 2106; February 7, 1994, Filed *47 Decision will be entered under Rule 155. For petitioners: *Martin A. Schainbaum[1] and Donald R. Share. For respondent: Mary Wynne. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax Year
Deficiency Sec. 6653(a) [1]
Sec. 6661 1986
$ 1,819,630
$ 90,981.50
$ 454,907.50
1987
10,862
--  --  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The tax deficiencies are, in large part, attributable to respondent's determination that Anthony Theophilos (Theophilos) received compensation income pursuant to section 83 in the amount of $ 3,516,320 from the receipt of stock in Greater Suburban Mortgage *48 Group, Inc. (GSM) in December 1986. Petitioners claim Theophilos acquired a beneficial interest in GSM in 1985, and that he paid full value for such interest. Thus, after concessions, the issues for decision are: 1. For purposes of section 83, the date on which Theophilos acquired a beneficial ownership interest in GSM and the value of the interest so acquired on such date. We hold that Theophilos acquired a beneficial interest in GSM (1,020 shares of its class B common stock) on December 10, 1986, and that the value of the 1,020 shares of class B common stock on December 10, 1986, was $ 2,366,479. 2. Whether petitioners are liable for an addition to tax for negligence pursuant to section 6653(a). We hold they are not. 3. Whether petitioners are liable for an addition to tax for substantial understatement of income tax pursuant to section 6661. We hold they are not. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners timely filed their joint Federal income tax returns for tax years 1986 and 1987. At the time the petition in this case was *49 filed, petitioners resided in Piedmont, California. Theophilos is an attorney licensed to practice law in the State of California. In early 1985, he was a partner at Morrison & Foerster, a California-based law firm. One of Theophilos' clients at Morrison & Foerster was GSM, a California corporation engaged in the mortgage banking business (GSM originated, sold, and serviced FHA, VA, and conventional residential loans). George Beegle (Beegle) was the sole shareholder of GSM prior to the date Theophilos acquired a beneficial interest in GSM. For many years prior to 1985, Theophilos and Beegle had a close professional and personal relationship. In February 1985, Beegle and Theophilos commenced a series of discussions which ultimately led to Theophilos' leaving the practice of law in order to join GSM. Theophilos summarized his understanding of the terms pursuant to which he would join GSM in a letter to Beegle dated May 3, 1985. The letter read: Dear George: I thought it would be a good idea to set down on paper the various points you and I have discussed in connection with my joining GSM. Actually, it's a good idea for two reasons. First, we should both be sure that *50 neither of us unintentionally miscommunicates anything of substance. Second, this letter should serve as a "road map" for the lawyers who will draft the necessary documents. I should also apologize in advance for some of the "nickel and dime" items that will be raised. As I mentioned on the phone the other day, I have this fear that I will assume some minor item is understood to be part of the deal, when in fact you have assumed it is not, thus leading to much grinding of teeth, friction and a buildup of resentment which wouldn't be very healthy for either of us. In any event, I believe we have agreed on the following: 1. The Big Picture. We're going to be partners! While you will always be the controlling party, the idea is that we will be in business together. Everything we build or earn through the company as of April 1, 1985 will be split 40/60. In return, you will get some relief from the day-to-day pressures of running GSM, an opportunity to lead a more normal life, normal working hours, and an opportunity to pursue your avocational interests. 2. Position and Salary. I will join GSM as its President at an annual salary of $ 150,000. In addition, on the start *51 of my employment I will receive a one-time "signing" bonus of $ 25,000 and an advance against my bonus (described below) of $ 25,000. At the start of each year thereafter, I will receive a $ 50,000 advance against that year's bonus. Although we haven't discussed it, I would rather forego the $ 50,000 advance against my bonus in the years after the first year and have my salary raised so that my base is in a 40/60 proportion to your base of $ 250,000 (i.e. approximately $ 166,000). Our bonuses will be in a 40/60 proportion. 3. Stock Purchase and Options. Although we haven't worked out all the details yet, we've agreed that I will purchase and hold options to purchase 40% of the stock of GSM. The price will be based on book value as reflected in GSM's March 31, 1985 financials, adjusted to account for the market value of certain items (such as servicing). Initially, I will purchase sufficient stock directly from you so as to net you $ 200,000. However, the funds for such purchase will be loaned to me by the company on a long-term basis. The balance of the stock will be acquired by me from the company at some time in the future through exercise of the options. I would *52 like to be able to finance this as well since I doubt that I will have the cash. Also, I will need to acquire the stock at least six months before any sale to a third party in order to justify long-term capital gains treatment. 4. Benefits. While employed by GSM, I would like the following benefits: (a) GSM will cover the cost of my Porsche (lease payments, maintenance, gas, insurance, etc.). At some point in the future, I would probably want to replace the Porsche with something else. (b) I assume I will be covered by GSM's hospitalization policy. My present firm also provides me with $ 500,000 in life insurance, which I would like to increase to $ 750,000. (c) I also assume that if you decide to grant yourself any other "perks," I would receive them as well. 5. Moving. I think you mentioned something about how we can work out a mortgage on my new home. I don't remember much about it so you'll have to fill this part in (waive points and some sort of buydown?). Also, I asked GSM to cover my mortgage here in Los Angeles if I found a home in San Francisco before I sold the one in Los Angeles (Pat tells me it's $ 4,800 a month). Finally, the company will cover my *53 actual moving expenses and provide me with a swing loan. 6. Commuting. While commuting between Los Angeles and San Francisco, I would like GSM to cover my air fare and to provide a modest apartment near the office and some form of transportation. 7. Buy-Sell Agreement. I'd like to use a form of "buy-sell" agreement that mirrors the one you, Steve and Matt used (we can treat the option rights as if they were stock). The buyout on death and termination of employment provisions protect us both. This letter turned out to be embarrassingly long. However, for the reasons I mentioned above, I think it's necessary. We can discuss the above items in more detail and as soon as we come to a meeting of the minds, I can tell the firm that I will be taking a leave of absence. The lawyers can do their thing after I come aboard. In the meantime, I'm excited about the opportunity to really build something through GSM. There is no doubt in my mind that working together we can do it easily.
Although the letter was not countersigned by Beegle, Beegle acknowledged that the letter set forth the basic terms of his agreement with Theophilos as of May 1985. On June 1, 1985, Theophilos *54 took a temporary leave of absence from Morrison & Foerster and began working at GSM. On June 5, 1985, Theophilos was elected GSM's executive vice president and assistant secretary. At first, Theophilos was employed by GSM on a temporary basis in order that he and Beegle could determine if they could work together. Theophilos testified that one of the reasons he took a leave of absence, rather than fully withdrawing from Morrison & Foerster, was "to give * * * [Beegle] an opportunity to work with me, to make sure * * * [Beegle] was convinced this was what he wanted to do". Sometime between June 1, 1985, and October 1, 1985, Theophilos and Beegle engaged attorneys to represent their respective interests. Theophilos retained Peter Richards Brown (Brown), a former law partner of his, and Beegle retained Jeffrey A. Turner (Turner). The legal fees of both Brown and Turner were paid by GSM. Theophilos formally withdrew as a partner of Morrison & Foerster on October 1, 1985. In his last year at Morrison & Foerster, Theophilos' distributive share of the law firm's income was approximately $ 150,000. His starting compensation at GSM was substantially greater. On October 16, 1985, *55 Brown sent Theophilos and Beegle various documents, including an agreement designated "Beegle Option Agreement" and another designated "Incentive Stock Option Agreement". These agreements provided that Theophilos would have the right to purchase 300 shares of GSM's stock from Beegle for $ 240,000 and 125 shares of GSM stock from GSM for $ 100,000. Both Theophilos and Beegle rejected Brown's proposal because from Theophilos' viewpoint it required a large cash outlay and from Beegle's viewpoint it resulted in deleterious tax consequences. E. Richard Conger (Conger), a tax partner at Coopers & Lybrand, was then retained to devise a method whereby Theophilos could obtain stock in GSM. At an unspecified point in time during the last quarter of 1985, Conger suggested that Theophilos and Beegle consider a preferred stock freeze by recapitalizing GSM, somewhat similar to a technique popular for estate planning purposes. Under Conger's plan, a portion of GSM's future appreciation could be shifted to Theophilos by creating "frozen" preferred stock to be retained by Beegle, and the sale of new common stock to Theophilos. Pursuant to Conger's plan, Theophilos would acquire stock in GSM *56 with a modest cash outlay and there would be no initial tax consequences to Beegle. Ultimately, a modified version of Conger's plan was agreed upon -- the modification being that two classes of common stock, rather than preferred and common stock, were used. In February 1986, GSM engaged the accounting firm of Hood and Strong (which had previously been GSM's accountants) to review a determination by GSM's board of directors that the fair market value of GSM as of September 30, 1985, was $ 2,130,200. By the end of February 1986, Brown had sent Conger a number of draft documents relating to the proposed recapitalization. Included among these documents were a plan of recapitalization, appropriate resolutions of GSM's board of directors, a shareholder agreement, and an employment agreement for Theophilos. Some of the draft documents were dated as of April 1, 1985. By this time, Theophilos had been elected president and chief operating executive of GSM and a member of its board of directors. Between late February 1986 and March 1986, the draft documents were circulated among Theophilos, Beegle, Brown, Turner, Conger, and the accountants at Hood and Strong. At some time in April *57 1986, Theophilos and Beegle executed a shareholder agreement, two employment agreements, and a number of other documents in connection with a recapitalization of GSM. Until the execution of those documents, all corporate documents of GSM reflected that Beegle was its sole shareholder. On June 5, 1986, petitioners submitted a residential loan application to GSM. On the application form, which was subsequently approved, petitioners did not list as an asset Theophilos' purported ownership interest in GSM. A draft residential loan application, which was prepared at a point in time prior to June 5, 1986, contained a crossed-out reference to Theophilos' purported 40-percent ownership interest in GSM as an asset. On June 6, 1986, Brown sent Theophilos and Turner drafts of the following documents relating to the proposed recapitalization: (1) Unanimous written consent of directors of GSM to the adoption of the plan of recapitalization and amendment of the articles of incorporation, dated January 15, 1986; (2) unanimous written consent of shareholder of GSM, dated January 15, 1986; (3) certificate of amendment of articles of incorporation of GSM; (4) notice of transaction pursuant to corporations *58 code section 25102(f); (5) revised employment agreement of George B. Beegle, dated April 1, 1985; (6) revised employment agreement of Anthony Theophilos, dated April 1, 1985; and (7) two-page letter agreement. Each of the aforementioned documents was ultimately signed or executed subsequent to June 6, 1986. The certificate of amendment of GSM's articles of incorporation was filed in the office of the California secretary of state on October 1, 1986. GSM's articles of incorporation, as amended, authorized the issuance of two classes of stock, designated class A common stock and class B common stock. The authorized number of class A common stock shares was 1,530, and the authorized number of class B common stock shares was 1,020. Each class of stock had the following stated rights: Re: Class A Common Stock
1. The holders of Class A Common Stock will be entitled to one (1) vote per share. 2. The Class A Common Stock is entitled to receive, out of funds legally available therefore, cumulative dividends from January 15, 1986 at the rate of $ 41.58 per share per annum (the "Preferred Dividend"). Such Preferred Dividends shall accrue from April 1, 1985, whether or not *59 earned, so that no dividends or other distribution shall be made with respect to the Class A Common Stock or the Class B Common Stock until all such Preferred Dividends for all past dividend periods have been declared and paid on the Class A Common Stock. 3. The Class A Common Stock is entitled to share on a per share basis with the Class B Common Stock in all dividends, other than the Preferred Dividends. 4. Upon a voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the Class A Common Stock shall be entitled to receive in preference to any payments of the Class B Common Stock a preferred liquidation amount of $ 1,386 per share (the "Preferred Liquidation Value"). No payment upon liquidation, dissolution or winding up will be paid on the Class B Common Stock until all accrued and unpaid Preferred Dividends and the Preferred Liquidation Value have been paid on the Class A Common Stock. In the event the assets of the Corporation are insufficient to pay the Preferred Liquidation Value required to be paid on the Class A Common Stock, the entire remaining assets will be paid to the Class A Common Stock and the Class B Common Stock will receive nothing. *60 Following payment of the Preferred Liquidation Value and all accrued and unpaid Preferred Dividends, the remainder of the assets distributed upon liquidation, dissolution or winding up will be divided on a per share basis among the Class A Common Stock and the Class B Common Stock.
Re: Class B Common Stock
1. The holders of the Class B Common Stock will have no voting rights. 2. The Class B Common Stock is entitled to share on a per share basis with the Class A Common Stock in all dividends after payment of all accrued and unpaid Preferred Dividends. 3. Following payment of the Preferred Liquidation Value and the accrued and unpaid Preferred Dividends to the Class A Common Stock the remainder of the assets distributed upon liquidation, dissolution or winding up will be divided on a per share basis among the Class A Common Stock and the Class B Common Stock. 4. GSM shall not, without the prior written consent of the holders of not less than a majority of the outstanding Class B Common Stock: a. Authorize or issue any other class or series of stock in addition to the Class A Common Stock and the Class B Common Stock; b. Issue in excess of one thousand five *61 hundred thirty (1,530) shares of Class A Common Stock or one thousand twenty (1,020) shares of Class B Common Stock; c. Authorize a stock split, a reverse stock split, a stock dividend, reorganization or recapitalization affecting the number of shares of Class A Common Stock or Class B Common Stock; d. Make, or permit any corporation, a majority of the voting stock of which is controlled by the Corporation (a "Subsidiary") to make any loan, or advance to any person, including, without limitation, any employee or director of the Corporation or any subsidiary except advances and similar expenditures in the ordinary course of business; e. Guarantee, directly or indirectly, or permit any Subsidiary to guarantee, directly or indirectly, any indebtedness except for indebtedness arising in the ordinary course of business; f. Merge with or into or consolidate with any other corporation, or sell, lease or otherwise dispose of all or substantially all of its properties or assets or enter into any reorganization; g. Amend the Articles of Incorporation to alter or change any rights, preferences or privileges of the Class A Common Stock or the Class B Common Stock; h. Redeem or repurchase *62 any Class A Common Stock or Class B Common Stock.
Except as otherwise expressly provided by law or [GSM's Articles of Incorporation], the Class A Common Stock has exclusive voting rights on all matters requiring a vote of shareholders, including election of directors, and the Class B Common Stock has no voting rights. If [GSM] violates any of the covenants [in GSM's Articles of Incorporation], which violation is not cured within thirty (30) days after written notice, the Class B Common Stock will have the right to elect the smallest number of directors constituting a majority of the authorized number of directors, and the Class A Common Stock will have the right to elect the remaining directors. The holders of the Class B Common Stock will have the right to call a special meeting of shareholders in accordance with Section 601 of the California Corporations Code for the purpose of electing members of the Board of Directors of the Corporation pursuant to this provision. The term of the directors elected by the Class B Common Stock shall continue until such covenant violation shall have been cured, after which the exclusive right to elect directors shall revert to the Class A *63 Common Stock, subject to renewal of the voting right upon any subsequent covenant violation.
On October 2, 1986, Coopers & Lybrand issued an opinion to GSM that the proposed recapitalization of the company qualified as a tax-free reorganization under section 368(a)(1)(E). The opinion states that it is based upon the following facts: Prior to the reorganization, there was one class of common stock with 2,550 shares outstanding. All stock was held by one shareholder. The sole shareholder exchanged the 2,550 shares of common stock for 1,530 shares of a new Class A common stock and 1,020 shares of Class B common stock. The shareholder in control of the corporation before the exchange remained in control. Additionally, the continuity of the business was uninterrupted by the exchange.
Conger testified that had Theophilos owned stock in GSM as of October 2, 1986 (i.e., prior to the recapitalization of GSM), Coopers & Lybrand would not have issued the opinion letter. On November 18, 1986, Hood and Strong issued a report stating that GSM's board of directors had reasonably estimated that $ 2,130,200 was the fair market value of GSM as of September 30, 1985. The report *64 further stated that the value of the class B common stock was "nominal" and that it represented a minority position possessing "no significant decision making authority". On December 10, 1986, the following events occurred: (1) Brown sent Theophilos two unexecuted GSM stock certificates and instructions on how to execute, issue, and transfer the certificates in accordance with the adopted plan of recapitalization; (2) GSM issued to Beegle a certificate representing 1,530 shares of GSM class A common stock and 1,020 shares of GSM class B common stock; (3) pursuant to Brown's instructions, and after the certificate for 1,020 shares of GSM class B common stock was issued to Beegle, Beegle endorsed that certificate over to Theophilos; (4) GSM subsequently canceled that certificate for 1,020 shares of GSM class B common stock; (5) GSM then issued to Theophilos a new certificate for 1,020 shares of GSM class B common stock; and (6) Theophilos gave Beegle a promissory note for $ 10,000 to acquire an ownership interest in GSM. (The $ 10,000 purchase price was approximately equal to the excess of the $ 2,130,200 value placed on GSM by its board of directors over the $ 2,120,580 liquidation *65 preference for GSM's class A common stock.) The note was satisfied in January 1987. On December 18, 1986, Brown mailed to the State of California commissioner of corporations a Notice of Transaction Pursuant to Corporations Code Section 25102(f). The notice was received by the State of California on December 19, 1986. The notice stated that the recapitalization of GSM was subject to California Code of Regulations (Title 10) Rule 260.103. GSM's fiscal year ends on March 31. GSM's revenues and pretax income increased dramatically from April 1, 1986, to March 31, 1987. Beginning in late 1985, and continuing into early 1986, Conger and Theophilos had discussions as to the tax consequences of Theophilos' receiving stock in GSM. Conger told Theophilos that "valuation was very important, and that in the recapitalization it was very important that the common stock he [Theophilos] acquire be worth what he was paying for it. If it was worth in excess of that [the amount Theophilos paid], that he [Theophilos] could have some taxable income". Theophilos replied that he thought he could sustain the position that he and Beegle had reached an agreement prior to the date the GSM stock was *66 issued to him and that the value of the company had not increased very much since the date his and Beegle's original agreement was reached. Petitioners' 1986 tax return (which was prepared by Coopers & Lybrand) reflected that Theophilos received $ 306,720 in compensation from GSM and a related company. No amount with respect to GSM stock received by Theophilos was included on petitioners' 1986 return. (Nor was any amount with respect to GSM stock received by Theophilos included on petitioners' 1985 return.) Petitioners' 1987 tax return reflected that Theophilos received $ 290,083 in compensation from GSM and a related company. No amount with respect to GSM stock received by Theophilos was included on petitioners' 1987 return. After a series of disagreements with Beegle, particularly during the first half of 1987, Theophilos resigned as president of GSM on September 30, 1987. Following his resignation, Theophilos requested that GSM purchase all of his class B common stock for cash in accordance with their shareholder agreement. GSM refused. As a result, in February 1988, Theophilos filed suit in the Superior Court for the State of California (lawsuit), seeking to require GSM, *67 Beegle, or both, to comply with the buyout provisions of the shareholder agreement. The relevant buyout provisions provided: 5. Mandatory Purchase of Shares. * * * (b) Within ninety (90) days following the termination of employment of Theophilos as an employee of the Company pursuant to the Employment Agreement between Theophilos and the Company of even date, Theophilos shall sell, and the Company, to the extent legally possible, shall purchase and redeem all of the Shares held by Theophilos at the Purchase Price set forth in paragraph 7 of this Agreement and pursuant to the Standard Terms and Conditions set forth in subparagraph (c) of paragraph 3 of this Agreement. In the event the Company cannot or does not purchase and redeem all of the Shares held by Theophilos pursuant to this subparagraph (b), then Theophilos shall sell and Beegle shall purchase the balance of such Shares at the same Purchase Price and pursuant to the Standard Terms and Conditions set forth above. * * * 7. Purchase Price. (a) The Purchase Price for the Shares to be purchased pursuant to paragraphs 5 and 6 shall be determined as of the date of death, the termination of employment, bankruptcy *68 or incapacity, as the case may be, of the Shareholder by first establishing the Fair Market Value of the Company as follows: (i) The book value of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis by the independent certified public accountants regularly engaged by the Company and adjusted as set forth below. (ii) No allowance of any kind shall be made for goodwill. (iii) Except as otherwise determined in good faith, all amounts payable shall be taken at face amount, and all accounts receivable shall be taken at face amount less a reasonable reserve for bad debts. (iv) The Company's mortgage servicing portfolio shall be valued at the highest price which a third party making a bulk or wholesale purchase would pay for a mortgage servicing portfolio of the type owned by the Company taking into consideration such matters as the nature, type and quality of the loans, including the delinquency ratio, interest rates and terms of the loans, as well as other relevant factors. This valuation shall be determined between the Company and the selling Shareholder. If they cannot agree on such valuation each shall appoint *69 within thirty (30) days after the occurrence of the event requiring the determination of the Purchase Price an appraiser familiar with the mortgage banking business. The two appraisers shall appoint a third appraiser. The average of the three appraisers shall be binding on the parties. The appraisal fee shall be paid by the Company. (v) Inventory and supplies shall be computed at cost. (vi) All furniture, fixtures and equipment shall be taken at the valuation appearing on the Company's books of account, with adjustment for the depreciation taken. (vii) All real estate and improvements shall be included at amounts to be determined by appraisal. Within thirty (30) days after the occurrence of the event requiring the determination of the Purchase Price, the Company and the selling Shareholder shall agree on an appraiser to appraise the real estate and improvements and determine their fair market value. The appraisal fee shall be paid by the Company. (viii) All accrued and properly accruable taxes and assessments shall be deducted as liabilities. (ix) Any securities traded on a national securities exchange shall be valued at their closing prices as of the date on which the determination *70 of Purchase Price is made. Securities traded over the counter shall be valued at the mean between bid and asked prices as of the date on which the determination of the Purchase Price is made, or on the preceding trading day.
(b) The Purchase Price of the Shares shall then be determined as follows: * * * (ii) If the Class B Common Stock is being purchased, the Purchase Price per share of the Class B Common Stock shall be: (A) the (1) Fair Market Value of the Company determined in Paragraph 7(a) above less (2) the Preferred Liquidation Value of the Class A Common Stock and all accrued and unpaid Preferred Dividends due on the Class A Common Stock, divided by (B) the number of all of the Shares (Class A Common Stock and Class B Common Stock) of the Company then issued and outstanding.
3. Right of First Refusal Upon Proposed Transfer of Shares. * * * (c) The Company shall * * *purchase * * * the Shares upon * * * the following terms and conditions: fifty per cent (50%) down payment and a promissory note for the balance bearing interest at the rate of prime plus one (1) per annum on the unpaid balance; said note to be paid in equal monthly installments of *71 principal and interest fully amortized over a two (2) year period beginning January 1 of the year following the year in which the down payment is made. Partial or full prepayment of the note shall be permitted without penalty only after December 31 of the year in which the down payment is made (the "Standard Terms and Conditions"). * * * GSM and Beegle denied any obligation to purchase Theophilos' stock and countersued Theophilos, arguing that the entire shareholder agreement should be rescinded. Theophilos and GSM were also adverse parties to an arbitration proceeding filed by Theophilos concerning his alleged entitlement to a severance payment due under his employment agreement with the company. During the arbitration proceeding, Beegle acknowledged that Theophilos had left Morrison & Foerster for an equity interest in GSM. However, Beegle did not testify as to what specific point in time that equity interest was to accrue to Theophilos. The arbitrator rendered a decision on September 6, 1988. The arbitrator decided that Theophilos' termination of employment under his employment agreement constituted a breach thereof, which was not cured by a subsequent letter, dated *72 November 24, 1987, from Theophilos to GSM. Nonetheless, the arbitrator ruled that Theophilos was entitled to receive a special termination bonus. The arbitrator further ruled that neither party could be considered the prevailing party and therefore neither party was entitled to the recovery of attorney's fees from the other. The dispute involved in the lawsuit was resolved pursuant to a settlement agreement and mutual release, dated April 3, 1989, pursuant to the terms of which GSM and Beegle agreed to pay Theophilos $ 1.75 million over a period ending at the earliest on April 3, 1990. In early 1990, GSM retained The Newport Group (Newport), an entity which, among other things, assists thrift institutions in acquiring and managing independent mortgage companies as subsidiaries, to perform a valuation of GSM and its class B common stock as of December 31, 1986. Newport produced a written report (the Newport Report), signed by Dennis McCarter, one of its founding partners, which valued Theophilos' class B common stock at $ 3,526,320, as of December 31, 1986. In 1990, Theophilos received from GSM a Form W-2c, Statement of Corrected Income and Tax Amounts, for tax year 1986. Thereon, *73 GSM indicated that Theophilos' wages for 1986 should be increased in the amount of $ 3,516,320, to reflect the value of the 1,020 shares of class B common stock received by Theophilos in 1986 ($ 3,526,320) over the amount paid ($ 10,000). The deficiency which respondent determined in petitioners' income for 1986 is largely attributable to the alleged receipt by Theophilos in 1986 of said $ 3,516,320 in wage income. In June 1990, GSM filed an amended Federal income tax return (Form 1120X) for its taxable year ending March 31, 1987, in which it claimed a deduction for the aforementioned $ 3,516,320. At trial, both Theophilos and respondent offered expert testimony, and introduced expert reports, to support their respective positions as to the value of GSM and its class B common stock at differing dates. Respondent relied on the testimony of McCarter and on the Newport Report. Petitioners' expert was Jerry Barrentine (Barrentine), managing director of Barrentine Lott & Associates, Inc., and they relied on his written report. Newport's Valuation
Newport valued GSM pursuant to the "component" method of valuation. Specifically, Newport assigned a range of values to each individual *74 component of GSM's operations. Under this method, Newport estimated the fair market value of GSM to be roughly $ 11 million as of December 31, 1986. That value assumed a sale of GSM, in its entirety, to an unrelated third party. The component parts utilized by Newport, and its estimated values for the components of GSM, are as follows: Component
Fair Market Value
Net worth
$  3,000,000
Servicing portfolio
5,600,000
Loan pipeline
1,250,000
Retail production
900,000-1,800,000
Total
10,750,000-11,650,000
Newport determined the value of GSM's servicing portfolio (a non-balance-sheet item) to be approximately 2 percent (200 basis points) of the total principal amount of loans held ($ 292 million), or $ 5.6 million. Included in the $ 292 million was $ 70 million in "warehouse" loans. (Warehouse loans are loans which have closed and are funded but have not been delivered to the ultimate investor.) The loan pipeline consists primarily of loans that are in-process and not yet funded. In valuing GSM's loan pipeline, Newport assumed that half of the loans in process would never be funded and that the other half would be worth approximately 2 percent (200 basis points) *75 of their total principal amount. In valuing GSM as a whole, Newport did not consider the condition of GSM's operating systems, the capability of the company's management team, or contingent liabilities. In valuing GSM's class B common stock, Newport started with the $ 11 million market value for GSM. From this $ 11 million market value, Newport subtracted $ 2,120,580, representing the liquidation preference of the class A shares ($ 1,386 preference per share multiplied by 1,530 class A shares), and $ 63,617, representing the preferred dividend of the class A shares ($ 41.58 dividend per share multiplied by 1,530 class A shares), leaving a residual value of approximately $ 8,815,800 for both the class A and class B shares. Newport determined that because of the favorable attributes of the class B shares, no discount was warranted for either lack of liquidity or the fact that the class B shares had no voting rights. [2] Newport determined the value of the class B shares, as of December 31, 1986, to be $ 3,526,320 (40 percent of the $ 8,815,800 residual amount). *76 Barrentine's Valuation
Barrentine valued GSM's class B common stock as of the following four dates: January 15, 1986, April 15, 1986, October 1, 1986, and December 10, 1986. In valuing GSM's class B common stock, Barrentine used two alternative methodologies: One methodology considered the impact of the shareholder agreement, the other did not. Under either method, Barrentine's evaluation of GSM's servicing portfolio was identical. Barrentine determined the present value of the servicing portfolio, as of December 10, 1986, to be $ 2,997,500, which was approximately 1.4 percent (140 basis points) of the total principal amount of loans held at that time, $ 214,482,123. Barrentine did not include warehouse loans in the $ 214,482,123 figure; he did not believe that warehouse loans are part of a mortgage servicing portfolio. Giving consideration to the impact of the shareholder agreement, Barrentine determined the fair market value of the class B common stock on December 10, 1986, as follows: he began with GSM's estimated net worth of $ 2,867,767, and then added $ 2,997,500, the present value of the servicing portfolio, for a subtotal of $ 5,865,267. From that $ 5,865,267 *77 figure, Barrentine subtracted $ 2,120,000, representing the liquidation preference of the class A shares ($ 1,385.62 preference per share multiplied by 1,530 class A shares), and $ 107,468 representing the accrued and unpaid preferred dividend of the class A shares, leaving a residual value of $ 3,637,799 for both the class A and B shares. Barrentine then determined the value of the class B shares to be equal to 40 percent of the $ 3,637,799 residual amount, or $ 1,455,120. Ignoring the impact of the shareholder agreement on the value of the class B common stock, Barrentine determined the fair market value of the class B common stock, as of December 10, 1986, as follows: he began with GSM's estimated net worth of $ 2,867,767, and then adjusted that figure upwards, to $ 3,317,767, by adding $ 450,000, representing a mark-to-market valuation adjustment for GSM's warehouse position and loan pipeline net of fallout. To that $ 3,317,767 figure, Barrentine added $ 2,997,500, the present value of the servicing portfolio, and $ 1,125,000, representing other intangible assets, for a subtotal of $ 7,440,267. From that $ 7,440,267 subtotal, Barrentine subtracted $ 2,120,000, representing *78 the liquidation preference of the class A shares ($ 1,385.62 preference per share multiplied by 1,530 class A shares), and $ 107,468, representing the accrued and unpaid preferred dividend of the class A shares, leaving a residual value of $ 5,212,799 for both classes of stock. Barrentine then took a 40-percent discount for lack of liquidity and voting rights of the class B common stock. Barrentine determined the value of the class B common stock to be $ 1,251,072. (Forty percent of $ 5,212,799, or $ 2,085,120, for the class B shares, less $ 834,048, representing a 40-percent discount for lack of liquidity and voting rights.) ULTIMATE FINDINGS OF FACT 1. Theophilos acquired a beneficial interest in GSM (1,020 shares of its class B common stock) on December 10, 1986. 2. The fair market value of the 1,020 shares of class B common stock acquired on December 10, 1986, was $ 2,366,479. OPINION Preliminarily, we note petitioners' claim that the real parties in interest in this case are themselves and GSM, not petitioners and respondent. They contend that the issuance of "a 3-1/4-year delinquent Form W-2c to Theophilos in 1990, approximately one month after GSM's final settlement *79 payment to Theophilos", which attributed $ 3,516,320 of "phantom income" under the auspices of section 83 is simply a "mechanism" by which GSM seeks to recoup the $ 1.75 million settlement award paid by GSM to Theophilos. [3] While petitioners' claim may or may not be valid, the motives of GSM in issuing the Form W-2c, as well as the fact that GSM could benefit from a consequential tax deduction, are irrelevant. Our task with respect to the first issue is to determine, for purposes of section 83, the date on which Theophilos acquired a beneficial ownership interest in GSM, and the value of the interest acquired on such date. *80 Section 83(a) provides: (a) General Rule. -- If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of -- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property,
shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. * * *
"Property", for purposes of section 83, includes personal property but does not include "an unfunded and unsecured promise to pay * * * property in the future." Sec. 1.83-3(e), Income Tax Regs. The term also includes a beneficial interest in assets which are transferred or otherwise *81 "set aside from the claims of creditors of the transferor, for example, in a trust or escrow account." Id. "In general, such property is not taxable under section 83(a) until it has been transferred (as defined in § 1.83-3(a)) to such person and becomes substantially vested (as defined in § 1.83-3(b)) in such person." Sec. 1.83-1(a), Income Tax Regs. For purposes of section 83(a), a "transfer of property occurs when a person acquires a beneficial ownership interest in such property (disregarding any lapse restriction, as defined in § 1.83-3(i))". Sec. 1.83-3(a)(1), Income Tax Regs.
Taxation under section 83(a) occurs at the first point in time, after a transfer of property, that the transferee's rights in the property received are either transferable to a bona fide third party purchaser, or are free of any substantial risk of forfeiture. A "substantial risk of forfeiture" exists where rights in property that are transferred are conditioned upon the future performance or nonperformance of substantial services by any person, or are conditioned upon the occurrence of a condition related to the transfer and the possibility of forfeiture is substantial if that condition is not *82 satisfied. Sec. 1.83-3(c)(1), Income Tax Regs. Property is "transferable" if it is not subject to a substantial risk of forfeiture and if the person performing the services or receiving the property can sell, assign, or pledge his interest in the property to a bona fide third party purchaser, other than the transferor. Sec. 1.83-3(d), Income Tax Regs.
Petitioners acknowledge that: (1) Property (class B common stock) was transferred to Theophilos in connection with his performance of services for GSM, and (2) such transfer of property comes within the scope of section 83. They disagree with respondent as to when Theophilos acquired a beneficial interest in the stock and the value of such on its acquisition date. Respondent determined that Theophilos did not receive a beneficial interest in the stock until December 10, 1986; petitioners contend that Theophilos received a beneficial interest in the stock on June 1, 1985, the date on which Theophilos resigned from his law partnership and joined GSM. Petitioners contend that should we determine that Theophilos acquired a beneficial interest in the stock subsequent to June 1985, then such acquisition occurred on various alternative *83 acquisition dates, each alternative date being prior to December 10, 1986. Respondent determined that the value of the stock received by Theophilos from GSM exceeded the amount paid therefor by $ 3,516,320; petitioners disagree. Petitioners contend that Theophilos paid full value for the stock, and thus they have no section 83 income. Issue 1. Timing and Value of Theophilos' Acquisition of a Beneficial Interest in GSM
Date of Acquiusition
Theophilos concedes that he did not receive a certificate for his class B common stock prior to December 10, 1986, but he claims he acquired a beneficial interest in GSM in 1985. We agree that a taxpayer can own an interest in a corporation without holding any physical evidence of such ownership. Richardson v. Shaw, 209 U.S. 365, 378-379 (1908). However, we do not agree that Theophilos acquired a beneficial interest in GSM prior to December 10, 1986. In determining whether a taxpayer has acquired a beneficial or equitable interest in a corporation, we have generally required the party seeking to assert such an ownership interest to demonstrate that he has fully performed all conditions precedent *84 to the acquisition, or furnished all required consideration for the transfer. Hayden v. Commissioner, 52 T.C. 1112, 1128-1129 (1969); Morgan v. Commissioner, 46 T.C. 878, 890-891 (1966); Carpenter v. Commissioner, 20 T.C. 603, 609 (1953), affd. 219 F.2d 635 (5th Cir. 1955); Scientific Instrument Co. v. Commissioner, 17 T.C. 1253, 1258-1259 (1952), affd. 202 F.2d 155 (6th Cir. 1953); Marsh v. Commissioner, 12 T.C. 1083, 1089-1090 (1949); Armstrong v. Commissioner, 6 T.C. 1166, 1173-1174 (1946), affd. 162 F.2d 199 (3d Cir. 1947). [4] The date of the physical issuance of the stock is not controlling as to when Theophilos acquired a beneficial interest in GSM. In the instant case, the GSM stock was in fact delivered to Theophilos on December 10, 1986, the same day he tendered payment for his beneficial interest in GSM. *85 Whether a taxpayer has fully performed all conditions precedent to the acquisition of a beneficial interest, or furnished all required consideration for the transfer, is a question of fact. Nelson v. Commissioner, T.C. Memo. 1968-203. Here, the facts indicate that Theophilos did not perform all conditions required to acquire an interest in GSM until he tendered his promissory note to Beegle in exchange for the 1,020 shares of class B common stock on December 10, 1986. Paragraph 3 of Theophilos' May 3, 1985, letter to Beegle states that Theophilos "will purchase and hold options to purchase 40% of the stock for GSM". Theophilos, in his letter, further states: "Initially I will purchase sufficient stock directly from you so as to net you $ 200,000". The letter goes on to state that "The balance of the stock will be acquired by me at some time in the future through the exercise of the options". These statements indicate that Theophilos and Beegle initially contemplated that Theophilos would acquire an interest in GSM by purchasing such interest for cash or promissory notes. Theophilos never tendered cash to Beegle on account of this planned purchase. *86 Rather, the payment tendered to Beegle in exchange for an interest in GSM was Theophilos' promissory note delivered to Beegle on December 10, 1986. Thus, in the setting of the instant case, Theophilos did not perform until December 10, 1986, a condition which is critical in order to acquire a beneficial interest in a corporation: He did not tender payment for an ownership interest. Petitioners' assertion that Theophilos acquired an interest in GSM in 1985 is without merit. The fact that Theophilos did not tender a single dollar to Beegle prior to December 10, 1986, indicates that, at most, Theophilos was until that date a party to an executory contract to purchase an interest in GSM at some point in the future. Petitioners' contention that Theophilos "paid" for his 40-percent interest in GSM at the time he withdrew from his law firm partnership and began working at GSM, is also without merit. The letter of May 3, 1985, in no way contemplates that Theophilos would acquire an interest in GSM in a manner other than by a cash purchase. Petitioners' argument that Theophilos would not have left Morrison & Foerster but for the fact that he would acquire an equity interest in GSM upon *87 the commencement of his employment is spurious, especially in view of the fact that his annual compensation more than doubled upon the commencement of his employment at GSM. The structure of the transaction by which Theophilos was to acquire an interest in GSM was constantly evolving. Initially, Theophilos contemplated acquiring (with money borrowed from GSM) a 40-percent interest in GSM through a combination of a stock purchase from Beegle (with Beegle netting $ 200,000 from the sale) and the exercise of options granted to Theophilos by GSM. Then the parties considered using a preferred stock freeze. Ultimately, the parties agreed on a reorganization using two classes of common stock. The continued negotiation regarding the structure of the recapitalization demonstrates that, although Theophilos and Beegle had agreed in May 1985 that at some future point Theophilos would acquire an equity interest in GSM, they did not have a meeting of the minds until June 1986 (when most of the recapitalization documents were finally executed) as to how or when such would be accomplished. And, under California law, the plan of recapitalization was not legally effective until October 1, 1986, *88 the date GSM's articles of incorporation were amended. The details governing Theophilos' receipt of an equity ownership interest in GSM were neither sufficiently precise nor adequately performed to constitute actual ownership until December 10, 1986, the date Theophilos tendered payment. The fact that a taxpayer backdates an important document does not change the fact that such document was executed on a date other than the recited date. Hensel Phelps Constr. Co. v. Commissioner, 74 T.C. 939, 950-951 (1980), affd. 703 F.2d 485 (10th Cir. 1983). We therefore reject petitioners' argument that the recited dates on the recapitalization documents should be controlling. It is clear that such documents were executed on a date subsequent to the dates recited therein. The language of the documents relating to the proposed recapitalization of GSM lends further support to respondent's contention that Theophilos did not acquire a beneficial interest in GSM until December 10, 1986. The shareholder consent that was needed to approve the recapitalization was drafted solely for the signature of Beegle, the sole shareholder of GSM at *89 the time. Further, the shareholder agreement, which was not executed until April 1986 at the earliest, contemplates a future acquisition of stock by Theophilos. To summarize, we find that Theophilos did not own a beneficial interest in GSM until December 10, 1986, the date he paid for the class B common stock. It was only then that Theophilos performed all conditions required to convert any executory contract rights into a beneficial ownership interest in GSM. Value of Stock Acquired
Under section 83(a), the fair market value of property received in connection with the performance of services, reduced by the amount paid therefor, is required to be included in the gross income of the person performing such services in the first year in which the rights of the person having the beneficial interest in the property are either transferable or are not subject to a substantial risk of forfeiture. The determination of the value of closely held stock is a matter of judgment, rather than of mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347. Since valuation is necessarily an approximation, *90 it is not required that the value we determine be one as to which there is specific testimony, provided that it is within the range of figures which properly may be deduced from the evidence. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner, supra at 939-940. The preliminary basis for determining fair market value starts with the classic definition: the price at which property would change hands between a willing buyer and a willing seller, both with knowledge of all the relevant facts and circumstances, and with neither being under any compulsion to buy or sell. United States v. Cartwright, 411 U.S. 546, 551 (1973). Section 83 modifies this classic definition as follows: if the property transferred in connection with the performance of services is subject to a restriction which by its terms will never lapse (a "nonlapse" restriction), such nonlapse restriction will be taken into account in determining the property's fair market value for purposes of section 83. Sec. 83(d)(1). For purposes of section *91 83, a nonlapse restriction is a permanent limitation on the transferability of property: (i) Which will require the transferee of the property to sell, or offer to sell, such property at a price determined under a formula, and (ii) Which will continue to apply to and be enforced against the transferee or any subsequent holder * * *
A limitation subjecting the property to a permanent right of first refusal * * * at a price determined under a formula is a permanent nonlapse restriction. * * * An obligation to resell or offer to sell property transferred * * * at its fair market value at the time of such sale is not a nonlapse restriction. * * * [Sec. 1.83-3(h), Income Tax Regs.]
We begin our determination as to the fair market value of GSM's class B common stock under section 83 by finding that such stock was not subject to any nonlapse restrictions. This finding is based on the following: while paragraph 3 of the shareholder agreement gives GSM, and then Beegle, a right of first refusal to purchase Theophilos' class B common stock prior to Theophilos' transfering his stock to a third party, the right of first refusal provisions do not contain a restriction as to *92 the price for which Theophilos can sell his stock. Section 83(d)(1) refers to a restriction that allows a sale of stock "only at a price determined under a formula" (emphasis added). Thus, contrary to petitioners' artful contentions, the formula price clauses in the shareholder agreement are of no consequence in determining fair market value under section 83, because the class B shares could be sold at a price other than that determined under the formulas. We do not agree with petitioners' assertion that the class B shares should be valued under the mandatory sale provisions of paragraph 5 of the shareholder agreement; but rather we believe that the valuation should be in connection with the sale of GSM as an operating business, or as a result of Theophilos' voluntarily selling his shares pursuant to paragraph 3 of the shareholder agreement. Theophilos was alive and employed by GSM when he acquired the class B common stock. And we note, that the restrictions of paragraph 5 would not by their terms be enforceable against Beegle (as a transferee or subsequent holder) if he were to purchase Theophilos' shares. As such, the restrictions of paragraph 5 are not a "permanent limitation *93 on the transferability of property" under section 1.83-3(h), Income Tax Regs. Accordingly, the provisions of paragraph 7 of the shareholder agreement do not apply to a valuation of the class B shares for purposes of section 83. Next, we believe, in this case, the component approach to valuation utilized by Newport is the proper starting point to determine the fair market value of GSM and GSM's class B common stock on December 10, 1986. Petitioners have established that the present value of GSM's servicing portfolio as of December 10, 1986, should be 1.4 percent, rather than 2 percent, of the total principal amount of loans held. We also believe other assumptions utilized by Newport should be modified. Based upon the net worth of GSM's assets as of December 31, 1986, the attributes of both classes of GSM stock, the relevant terms of the shareholder agreement, the employment agreements, the amended articles of incorporation, and each party's expert report, we conclude that the value of GSM, as of December 10, 1986, was $ 8,757,750. Net worth of GSM assets
$ 3,000,000
Plus present value of servicing portfolio
Principal balance
$ 214,482,123
Plus warehouse loans
70,000,000
Subtotal
284,482,123
Present value multiple
1.4%
3,982,750
Plus loan pipeline
Total loans in process
125,000,000
Less loan fallout
62,500,000
Subtotal
62,500,000
Present value multiple
1.4%
875,000
Plus retail production
900,000
Total value of GSM as
8,757,750
of Dec. 10, 1986
*94 We further conclude that the value of GSM's class B common stock, as of December 10, 1986, before any discount for a lack of liquidity and voting rights, was $ 2,629,421. Total value of GSM as of December 10, 1986
$ 8,757,750
Less class A liquidation preference
2,120,580
Less class A accrued dividends
63,617
Value classes A and B stock
6,573,553
Class B percentage
40%
Value class B stock (before discount)
2,629,421
Petitioners contend that the class B shares should be discounted to reflect both their lack of liquidity and their lack of voting rights. Respondent, not surprisingly, disagrees. Given the level of protection afforded the class B shares under the relevant corporate documents, we believe no discount is warranted for lack of voting rights. The class B shares have broad consent powers: without the consent of a majority of the class B shares, the board of directors could not undertake certain actions. While most of the consent powers were installed to prevent the dilution of the power of the class B shares, many of the consent powers were unusually broad. In particular, the class B shareholder's consent power over any sale of substantially all corporate *95 assets appears to give the class B shareholder a constructive veto on the sale of GSM as an entity. We believe, however, that a discount is warranted for the lack of liquidity of the class B shares; the amount of such discount in our opinion is 10 percent. Thus, we conclude the value of the class B common stock, as of December 10, 1985, to be $ 2,366,479 ($ 2,629,421 minus a $ 262,942 discount for lack of liquidity). Issue 2. Negligence
For taxable year 1986, section 6653(a)(1) imposes an addition to tax in the amount of 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes a further addition to tax in an amount equal to 50 percent of the interest due on the portion of the deficiency attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would under the circumstances. Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-265; Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), *96 affg. in part and remanding 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of proving that their underpayment was not attributable to negligence or intentional disregard of rules and regulations. Rule 142; Delaney v. Commissioner, 743 F.2d 670 (9th Cir. 1984), affg. T.C. Memo. 1982-666. In our opinion, petitioners have met this burden. Petitioners retained a major national accounting firm to advise them with respect to tax matters. That accounting firm not only prepared petitioners' 1986 tax return but also advised Theophilos and GSM with respect to the recapitalization of GSM. Difficult substantive questions of tax law were involved. Petitioners did not receive a Form W-2c attributing to Theophilos wage income in connection with his acquisition of GSM's class B common stock until June 1990. On balance, we believe the 1986 underpayment of tax resulting from petitioners' failure to include, under section 83, the fair market value of GSM's class B common stock, is not attributable to petitioners' negligence or intentional *97 disregard of rules and regulations. Accordingly, we do not sustain respondent's determination that petitioners are liable for the additions to tax under sections 6653(a) and 6653(a)(1) and (2). Issue 3. Substantial Understatement of Income Tax
Section 6661 provides for an addition to tax in the amount of 25 percent of the understatement if there is a substantial understatement of tax. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). Generally, an understatement is equal to the amount of the tax to be shown on the return less the amount of the tax actually shown on the return. Sec. 6661(b)(2)(A). In determining the taxpayer's liability for the addition to tax, the amount of the understatement is reduced by that portion of the understatement which is attributable to (1) the tax treatment of any item if there was or is substantial authority for such treatment, or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the *98 return or in a statement attached to the return. Sec. 6661(b)(2)(B). An appeal of the instant case lies to the Ninth Circuit Court of Appeals. In Vorshek v. Commissioner, 933 F.2d 757 (9th Cir. 1991), affg. in part and revg. in part an Oral Opinion of this Court, the Court of Appeals held that the Commissioner should have waived the penalty provided for in section 6661(a) because the taxpayers established that there was reasonable cause for the understatement and that they acted in good faith. Based on the facts in this case, we believe the Court of Appeals for the Ninth Circuit would conclude that petitioners have met the standard for waiver of the section 6661 addition to tax. See Erhard v. Commissioner, T.C. Memo. 1992-376. Accordingly, respondent's determination as to the addition to tax for substantial understatements of income tax for taxable year 1986 is not sustained. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
*. An amicus curiae brief was filed by Karen L. Hawkins as attorney for Greater Suburban Mortgage Group, Inc.↩
1. Martin A. Schainbaum withdrew as counsel of record for petitioners by motion granted on Feb. 23, 1993.↩
1. Plus 50 percent of the interest due on the deficiency.↩
2. Newport acknowledged that in smaller companies, like GSM, nonvoting stock is typically discounted between 5 percent and 20 percent. But Newport chose not to apply any such discount in its valuation because of the contractual rights granted to the class B shares.↩
3. Sec. 83(h) in general provides that in the case of a transfer of property in connection with the performance of services, a deduction is allowable to the person or entity for whom such services were performed. The amount of the deduction is equal to the amount includable as compensation in the gross income of the service provider. Such deduction is allowed in the taxable year of the person or entity for whom the services are provided in which or with which ends the taxable year of the service provider in which such amount is includable as compensation.↩
4. These cases were not decided under sec. 83, but the logic contained therein is applicable to situations arising under sec. 83.↩