**Stephen D. PAHL; Louise A. Pahl,**
**Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Respondent–**
**Appellee.**

No. 96–70402.

United States Court of Appeals,
Ninth Circuit.

Submitted Feb. 11, 1998.

Decided July 29, 1998.

Stephen D. Pahl, Pro se, San Jose, California; Thomas M. Gosselin, Pahl & Gosselin, San Francisco, California, for petitioners-appellants.

Bruce R. Ellisen and Annette M. Wietecha, United States Department of Justice, Tax Division, Washington, DC, for respondent-appellee.

Before: D.W. NELSON, BOOCHEVER, and REINHARDT, Circuit Judges.

BOOCHEVER, Circuit Judge:

The Tax Court denied the petition for redetermination of federal income taxes for tax year 1990 filed by Stephen Pahl and his wife, Louise.[1] The Tax Court concluded that in 1990 Stephen Pahl was a shareholder in the law firm Niesar, Pahl, Cecchini & Gosselin (the "firm"), a subchapter S corporation, and therefore Pahl should have reported a pro rata share of the law firm's 1990 income on his tax returns. The Tax Court also determined that Pahl negligently failed to report as income a $6,500 automobile allowance from the firm, and thus is liable for taxes and a 26 U.S.C. § 6662 negligence penalty. *Pahl v. Commissioner,* 71 T.C.M. (CCH) 2744, 1996 WL 167967 (1996). Pahl appeals.

### I. *Facts and procedural history*

During the first part of 1989, Stephen Pahl and Thomas Gosselin negotiated with Gerald Niesar and Garrett Cecchini to join their law firm, Niesar & Cecchini. The firm had been organized two years earlier as a Subchapter S corporation, which has the feature of paying no taxes and instead passing through profits and losses pro rata to its shareholders. Pahl and Gosselin agreed to join the firm effective August 9, 1989, and each agreed to become a 25–percent shareholder of the law corporation by purchasing 1000 shares of stock for 25 percent of the audited book value of the corporation as of July 31, 1989.

Pahl and Gosselin joined the firm, but soon were disenchanted. By May 1990, they had informed Niesar and Cecchini of their intention to separate from the firm on June 30, 1990. During Pahl's brief tenure at the firm, some aspects of the initial agreement were fulfilled, but others were not. Some of the corporate and state bar formalities were attended to, but others were not. Resolving the main question on appeal, whether Pahl was a shareholder of the firm during 1990, requires a determination whether his and the other lawyers' acts were sufficient to make him one.

A "Notice of Special Meeting" of the board of directors of Niesar & Cecchini, dated August 3, 1989, described the business to be conducted that same day:

1. Sell Thomas M. Gosselin and Stephen D. Pahl:

---

1. The parties are Stephen and Louise Pahl, but the facts of this case involve only Stephen Pahl ("Pahl" or "taxpayer"). Louise Pahl is a party because she filed a joint return with Stephen Pahl for the year in question.

1,000 shares at price to be determined by auditor at July 31, 1989.

2. Amend articles to change name to Niesar, Pahl, Cecchini & Gosselin.

3. Effective August 8, 1989

Elect Stephen D. Pahl and Thomas M. Gosselin as directors. (Amend Bylaws to provide for four directors.)

4. Bank Resolutions re 500K loan.

5. Any other legitimate business that may come before the meeting.

The minutes of the August 3, 1989 meeting of the board of directors report that the board (Niesar and Cecchini) determined and resolved as follows:

WHEREAS, this Board of Directors has determined that the issuance of additional stock in the corporation would benefit the corporation; and

WHEREAS, this Board has determined that Thomas M. Gosselin and Stephen D. Pahl are suitable shareholders whose participation would benefit the corporation and each is an active member of the California Bar, and

NOW, THEREFORE, BE IT RESOLVED, that the corporation shall issue and sell to each of Thomas M. Gosselin and Stephen D. Pahl one thousand (1,000) shares of common stock, such action to take effect on August 9, 1989; and

FURTHER RESOLVED, that the price to be paid by Messrs. Pahl and Gosselin for such shares shall be determined by an audit of this corporation's balance sheet as at July 31, 1989; and

FURTHER RESOLVED, that each of Messrs. Pahl and Gosselin shall pay in cash, the amount equal to one-half of the net worth of the corporation as determined by reference to such audited balance sheet as at July 31, 1989, as and for the total purchase price of said purchasers' 1000 shares of common stock.

At the same meeting, Pahl and Gosselin were elected directors of the corporation. Pahl

was elected President of the board, Gosselin and Cecchini became Vice–Presidents, and Niesar remained Secretary. The board authorized Pahl to negotiate a half-million dollar line of credit with Silicon Valley Bank, which Pahl and Gosselin personally guaranteed because Niesar and Cecchini were rated poor credit risks.

On August 9, Niesar and Cecchini executed a Certificate of Amendment of Articles of Incorporation changing the firm name to "Niesar, Pahl, Cecchini & Gosselin, A Professional Corporation." The Amendment was filed with the Secretary of State on August 29, 1989, and included a two-page declaration by Cecchini listing four shareholders of the corporation as Gerald V. Niesar, Stephen D. Pahl, Garrett L. Cecchini, and Thomas M. Gosselin. The Declaration lists 17 "[e]mployees ... engaged in the practice of law," including all of the named partners. The Amendment is accompanied by a "Guarantee" of payment by the corporation for errors and omissions related to law practice. That document begins "We, the undersigned, as the shareholders of Niesar, Pahl, Cecchini and Gosselin, a Professional Corporation, hereby guarantee ..." and it is signed by all four named partners, including Stephen Pahl.[2]

Pahl took over as managing partner of the firm, managed the books, and hired and fired employees. The Commissioner and Pahl agree that the intended audit of the balance sheets to determine book value of the corporation was never conducted, and Pahl never paid for any shares. Pahl claims that he did not pay for the shares because he discovered the book value of the firm was inflated.

In March 1990, Niesar filed a law corporation annual report listing Pahl as a shareholder of the firm, which Niesar signed and thereby declared under penalty of perjury to be true and correct.

Pahl and his law partners entered a separation agreement that was made effective June 30, 1990. Pahl and Gosselin agreed to

**2.** During cross-examination in the Tax Court, Pahl stated that in 1989 he did not see the amending papers, including the Guarantee, and that he did not recall signing the Guarantee. [RT at 53, 59] However, the Tax Court credited Niesar's testimony "that he actually saw Pahl sign the guarantee." *Pahl,* 71 T.C.M. (CCH) at 2747 n. 1. Such credibility determinations are for the tax court. *McKay v. Commissioner,* 886 F.2d 1237, 1238 (9th Cir.1989).

assume the corporation's $500,000 credit line, which they had guaranteed. In exchange, they received physical assets and accounts receivable roughly equal to the balance on the credit line and paid the firm $8,000. Paragraph 7 of the agreement provides that the firm "will promptly amend its registration with the California State Bar to reflect that neither Pahl nor Gosselin is a shareholder, officer, director or employee of the Firm as of July 1, 1990."

After the separation, the firm issued Pahl an IRS form K–1 reflecting a 25–percent pro rata share of the firm's losses in 1989. Pahl did not claim the loss on his 1989 tax return, and instead advised the IRS that the K–1 was issued in error. In 1991, he received a K–1 reflecting a 25 percent pro rata share of the firm's profits for 1990 and a form 1099 reflecting $6,500 of nonemployee compensation. Pahl failed to report the 25 percent share of the firm's 1990 profits, but he alleges that the $6,500 was included on his Schedule C (Profit or Loss from Business) under an $8,530 item described as "Attorney Legal Service–Leasing."

## STANDARD OF REVIEW

The Tax Court's "factual determinations are reviewed for clear error, but the correctness of the legal standards applied by the Tax Court, and the application of the legal standards to the facts found, are reviewed de novo." *Sacks v. Commissioner*, 69 F.3d 982, 986 (9th Cir.1995). The "Tax Court's opinions bearing on the Internal Revenue Code are entitled to respect because of its special expertise in the field," but "[w]e owe no deference to the ... Tax Court on issues of state law." *Harbor Bancorp v. Commissioner*, 115 F.3d 722, 727 (9th Cir. 1997) (as amended) (quotations omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998).

## DISCUSSION

I. *Pahl's shareholder status*

A. *Controlling law*

The parties dispute whether state or federal law controls our determination whether Pahl was a shareholder of the firm. Pahl claims that state law controls, citing *Swenson v. Commissioner,* in which the Tax Court held that "[i]n determining when petitioner acquired the stock in question, we must look to the applicable State law." 37 T.C. 124, 131, 1961 WL 1314 (1961), *rev'd on other grounds,* 309 F.2d 672 (8th Cir.1962). The Commissioner quotes this court's holding that "[t]he question of who is a shareholder as the term is used in Subchapter S must be determined by federal rather than state law." *Kean v. Commissioner,* 469 F.2d 1183, 1186 (9th Cir.1972).

This apparent discrepancy is addressed in *Cabintaxi Corp. v. Commissioner,* 63 F.3d 614 (7th Cir.1995), in which the Seventh Circuit had to decide "whether a person was a shareholder on the date of the election to be taxed under Subchapter S," which it deemed "equivalent to the question whether, had there been a valid election [to be taxed under Subchapter S], he would have been required to report as personal income profits earned by the corporation on that date." *Id.* at 616. Because Pahl's law firm was a valid Subchapter S corporation, the question here is thus similar to the one addressed in *Cabintaxi,* i.e. whether Pahl was a shareholder of the Subchapter S corporation.

The *Cabintaxi* court reasoned that the common answer to these questions "depends on whether [the taxpayer] would have been deemed a beneficial owner of shares in the corporation...." *Id.* at 616. Writing for the court, Chief Judge Posner distinguished *Kean* and explained the proper role of state law in the analysis:

> Whether the ... investors were beneficial owners of shares in Cabintaxi depends in the first instance on the wording of the agreement between the investors and Cabintaxi, and in the second on state contract and corporate law, which might constrain the agreement, or fill gaps in it, or do both. For, although the meaning of "shareholder" for purposes of Subchapter S election has been said to be a matter of federal law rather than of state law, *Kean v. Commissioner* ..., this means only that it is federal law which determines which kind of shareholder—namely, beneficial rather

than record—is required to elect in order for the corporation to achieve Subchapter S status. Whether a particular investor was a shareholder of that kind—in this case was a beneficial shareholder of Cabintaxi on the date of the election—is an issue of state law.

*Id.* at 617. *Cabintaxi* drew upon two Supreme Court cases, both involving tax liens: *United States v. National Bank of Commerce,* 472 U.S. 713, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985), and *Aquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

In *Aquilino,* the Court addressed the question "whether and to what extent the taxpayer had 'property' or 'rights to property' [in a debt owed to the taxpayer] to which [a] tax lien could attach." *Id.* at 512, 80 S.Ct. 1277 (alterations added). The Court remanded the case to the New York state court because

> both federal and state courts must look to state law, for it has long been the rule that in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property * * * sought to be reached by the statute.

*Id.* at 512–13, 80 S.Ct. 1277.[3]

In *United States v. National Bank of Commerce,* seeking to resolve whether the IRS could levy against a depositor's joint bank account, the Court held that in " 'the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.' " 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985) (quoting *Aquilino,* 363 U.S. at 513, 80 S.Ct. 1277). The Court reasoned that

> This follows from the fact that the federal statute creates no property rights but merely attaches consequences, federally defined, to rights created under state law. And those consequences are a mat-

ter left to federal law. Once it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of the statute, state law is inoperative, and the tax consequences thenceforth are dictated by federal law.

*National Bank,* 472 U.S. at 722, 105 S.Ct. 2919 (citations, alterations, and internal quotations omitted).

Thus, courts look to the tax statutes and interpreting cases to determine what interest is sufficient to trigger tax liability, and to state law to determine whether the taxpayer had such an interest. In so doing, we review both form and substance. The Supreme Court

> has never regarded the simple expedient of drawing up papers as controlling for tax purposes when the objective economic realities are to the contrary. In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding.

*Frank Lyon Co. v. United States,* 435 U.S. 561, 573, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) (quotations and citations omitted) (applying an economic realities test to determine whether a sale and lease-back arrangement established the ownership of a building for tax purposes); *Swift Dodge v. Commissioner,* 692 F.2d 651, 653–54 (9th Cir.1982) (assessing the burdens, benefits, legal rights, and legal duties under state law to decide ownership for tax purposes).

Thus, as in *Kean,* we look to federal law to determine what interest creates tax liability. We look, however, to state law to determine whether the taxpayer has the requisite interest.

### B. *Pahl's beneficial ownership*

The Tax Court correctly examined whether Pahl had become a "beneficial owner" of

---

**3.** The Supreme Court explained why state law should control:

> It is suggested that the definition of the taxpayer's property interests should be governed by federal law.... We think that this approach is unsound because it ignores the long-established role that the States have played in creating property interests and places upon the

courts the task of attempting to ascertain a taxpayer's property rights under an undefined rule of federal law. It would indeed be anomalous to say that the taxpayer's 'property and rights to property' included property in which, under the relevant state law, he had no property interest at all.

*Aquilino,* 363 U.S. at 513 n. 3, 80 S.Ct. 1277.

shares, the ownership interest that triggers the tax statute. *See Hoffman v. Commissioner,* 47 T.C. 218, 233, 1966 WL 1116 (1966), *aff'd,* 391 F.2d 930 (5th Cir.1968) ("Our conclusion that beneficial ownership of the stock, as opposed to technical legal title thereto, is critical in determining who is a shareholder, is supported by the regulations as well as the general legislative purpose underlying subchapter S.").[4]

Determining who is a beneficial shareholder requires analysis of the actual role the shareholder has played in corporate governance. For example, the Fifth Circuit has explained:

> Shareholders in close corporations generally have some role (however formal or minor) in corporate governance, bear a risk of corporate failure, and stand to share in corporate successes. The extent to which the individual in question exhibits these characteristics helps determine whether he is a beneficial shareholder. These characteristics are generally evidenced by the parties' understanding of their relationship to the corporation and by their behavior both before and after the challenged transaction. That understanding and behavior provide a much more reliable guide than the formal rights that may exist between the parties.

*Wilson v. Commissioner,* 560 F.2d 687, 690 (5th Cir.1977).

The Tax Court functionally analyzed Pahl's relationship to the law firm, and found Pahl's position of leadership and control, as well as his remuneration, consistent with his being a principal, rather than a mere employee. The Tax Court found that Pahl's "positions, as president, managing partner, and chief financial officer, strike us as typical of an owner (partner) or principal, rather than as a mere employee." *Pahl,* 71 T.C.M. (CCH) at 2747. The law firm changed its name to include Pahl's name. *Id.* Further, Pahl's "compensation package resembled that of a shareholder-employee, not a nonshareholder employee."

Pahl bore the risk of failure in two important respects. He personally guaranteed the $500,000 line of credit the firm obtained from Silicon Valley Bank, thereby making himself potentially subject to losses if the firm suffered financial reversals. Also, he signed the errors and omissions guarantee whereby he assured that the firm would settle its liabilities with clients. Pahl also stood to share in corporate successes, had there been any. Pahl agreed to pay 25 percent of the book value of the corporation as of July 31, 1989, as determined by an audit of the balance sheets to be conducted later. Had the deal been profitable, Pahl might not have chosen to separate from the firm, or he might have obtained a more favorable separation package.

### C. *California law*

■ Without citing *Kean,* the Tax Court decided that under federal law, taxability depends on whether Pahl was a beneficial owner of shares and concluded that Pahl was a beneficial shareholder. The Tax Court, however, did not explicitly consider whether Pahl was a beneficial shareholder of the firm under California law. Whether Pahl was a beneficial shareholder depends upon California "state contract and corporate law, which might constrain the agreement, or fill gaps in it, or do both." *Cabintaxi,* 63 F.3d at 617. Because there are no factual disputes that were not resolved by the Tax Court, we elect to resolve this issue in the first instance rather than remand to the Tax Court. *See United States v. Ford,* 650 F.2d 1141, 1144 (9th Cir.1981). We must determine, therefore, whether California law constrains the agreement so as to have prevented Pahl from becoming a beneficial shareholder of the firm.

---

4. See also *Frank Lyon,* 435 U.S. at 572, 98 S.Ct. 1291 ("taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed-the actual benefit for which the tax is paid") (quotations omitted); *Pacific Coast Music Jobbers, Inc. v. Commissioner,* 55 T.C. 866, 874, 1971 WL 2529 (1971), *aff'd,* 457 F.2d 1165 (5th Cir.1972) ("[t]he court looks to that party to the transaction who has the greatest number of the attributes of ownership.").

#### 1. *Corporate formalities*

Pahl contends that because corporate formalities were not met, he could not have become a beneficial shareholder. The California Corporate Securities Law of 1986 makes it unlawful for any person to offer or sell any security unless the security has been qualified (i.e., a permit has been obtained from the Corporations Commissioner) or is exempt under provisions of the Corporations Code. Cal. Corp.Code § 25120 (West 1989).

Pahl relies upon the Tax Court decision in *Theophilos v. Commissioner,* 67 T.C.M. (CCH) 2106, 1994 WL 31445 (1994), which involved a lawyer who quit his job at a law firm to join a mortgage company. In that case, the Tax Court found the attorney did not own a beneficial interest in the mortgage company until the date he paid for the Class B common stock. *Id.* at 2116.

However, this court reversed the Tax Court in *Theophilos v. Commissioner,* 85 F.3d 440 (9th Cir.1996), and determined that Theophilos acquired a beneficial interest in the stock not when he paid for the shares, but when the parties executed a shareholder agreement, two employee agreements, and other documents. Notably, that was six months before the mortgage company filed amended articles of incorporation with the state, formally creating two classes of stock, Class A and Class B. The Commissioner in that case argued that because "California law prohibited the sale of securities by [the mortgage company] prior to the amendment to [its] articles of incorporation," the mortgage company "could not have enforced its right to [the purchase price] against the taxpayer until [the mortgage company] obtained approval for its amended articles of incorporation on October 1, 1986." *Id.* at 446. We disagreed, finding that "California enforces pre-incorporation subscription agreements as long as the corporation is successfully incorporated, and this reasoning applies with even more force for established corporations that need only amend their articles to reclassify their stock." *Id.* (citation omitted). In the case at bar, the law firm, an existing corporation, resolved to issue stock and nothing would have prevented its doing so to satisfy its end of the bargain. Pahl's agreement with Niesar & Cecchini could be enforced under California law even though it was executed before any shares were issued.

California courts recognize beneficial shareholders' interests absent legal title. *Pearce v. Superior Court,* 149 Cal.App.3d 1058, 197 Cal.Rptr. 238, 244 (Ct.App.1984) (finding that income beneficiary of a trust holding corporate stock could bring a derivative suit). We conclude that under California law, Pahl held a beneficial shareholder's interest in the corporation.

#### 2. *Statute of frauds*

Pahl asserts that under the California Commercial Code, a contract for the sale of securities is not enforceable unless there was a writing signed by the party to be charged or other conditions were met. Presenting the issue as whether either party to the oral contract can enforce the agreement erroneously assumes that the contract remained executory. The Tax Court found the oral contract was not executory because substantial parts of the agreement had been performed. Although Pahl did not pay for the shares, the firm changed its name, Pahl was made President of the board, managing partner, and CFO, and he guaranteed a $500,000 credit line for the corporation, all according to the oral agreement. Pahl could have estopped the firm from invoking a statute of frauds defense against enforcement of the agreement, based on his part performance and justified reliance. *Monarco v. Lo Greco,* 35 Cal.2d 621, 220 P.2d 737, 739–40 (1950) (holding that the doctrine of estoppel may be applied where one party has been induced by the other to seriously change his position in reliance on the contract, or where unjust enrichment would result). The Tax Court did not err in holding that enforcement of the contract by which Pahl was to acquire shares of the corporation was not barred by the statute of frauds.

#### D. *Conditions precedent*

Pahl contends that because he did not pay for any shares, he did not fully perform his part of the oral contract to purchase shares, and therefore he never acquired an

ownership interest in the firm. Pahl relies upon *Theophilos* for the rule that in "determining whether a taxpayer has acquired a beneficial or equitable interest in a corporation, we have generally required the party seeking to assert such an ownership interest to demonstrate that he has fully performed all conditions precedent to the acquisition, or furnished all required consideration for the transfer." *See Theophilos*, 85 F.3d at 444. It is conceded that Pahl did not acquire shares by paying for them, and he characterizes both payment and the audit of the law firm's balance sheet as "conditions precedent," which prevented his acquiring equitable ownership.

Whether either payment or an audit was a condition precedent depends upon whether the parties intended it to be. *Sosin v. Richardson*, 210 Cal.App.2d 258, 26 Cal.Rptr. 610, 613 (Ct.App.1962). The Tax Court relied upon the minutes of the August 3, 1989 board meeting as evidence of the intention of the parties: "the corporation 'shall issue and sell to * * * [petitioner] one thousand (1,000) shares of common stock, *such action to take effect on August 9, 1989.'*" (Emphasis in original.) The Tax Court determined that "the board understood that petitioner would become a shareholder on August 9, 1989, and would pay for his shares when the price could be determined by an audit of the corporation's balance sheet as of July 31, 1989." *Pahl*, 71 T.C.M. (CCH) at 2747. The Tax Court also heard the testimony of Pahl, Gosselin, Cecchini, and Niesar-all the parties to the oral agreement. The Tax Court found Pahl's "testimony that he was not a shareholder of Niesar Pahl ... unconvincing." *Id.* Because "the guarantee that accompanied the Certificate of Amendment filed when Niesar Pahl changed its name is signed by petitioner as shareholder," the Tax Court was "convinced that petitioner understood, and intended, that he would become a shareholder of Niesar Pahl on or about August 9, 1989." *Id.* Such credibility determinations are for the tax court. *McKay v. Commissioner*, 886 F.2d 1237, 1238 (9th Cir.1989).

The Tax Court applied the proper standard for determining whether Pahl was a "beneficial shareholder." The "question whether an individual meets [that standard] and qualifies as a beneficial shareholder is one of fact." *Wilson v. Commissioner*, 560 F.2d 687, 690 (5th Cir.1977). The Tax Court's factual finding that Pahl was a beneficial shareholder was not clearly erroneous.

## II. Pahl's failure to report $6,500 nonemployee compensation

Pahl claims that the $6,500 automobile allowance is reflected on his Schedule C (Profit or Loss from Business), which describes gross receipts of $8,530 from "Attorney Legal Service–Leasing." The Tax Court "fail[ed] to see the connection between the automobile allowance and any attorney legal service-leasing business of petitioner's," and found that Pahl's explanatory "testimony was unconvincing." *Pahl*, 71 T.C.M. (CCH) at 2748. Curiously, Pahl offers no additional explanation in his opening brief and seems to have abandoned the issue altogether in his reply brief. The four sentences he devotes to the issue in his opening brief are completely unilluminating, and they only reiterate the testimony which the Tax Court chose not to credit. We have no adequate basis upon which to second-guess the Tax Court's finding on this issue.

## III. 26 U.S.C. § 6662 negligence penalty

The Commissioner's determination of a penalty is presumed correct, thus Pahl "[ha]s the burden of proving that [his] underpayment was not the result of negligence or disregard." *Allen v. Commissioner*, 925 F.2d 348, 353 (9th Cir.1991). The Tax Court noted that Pahl failed to "aver any specific facts in support of [his] assignment of error." *Pahl*, 71 T.C.M. (CCH) at 2748. Further, the court noted that "petitioners propose no findings of fact specifically relating to the penalty, nor do they set forth any arguments with regard thereto." *Id.* Pahl's only argument on appeal is that if he did not fail to report and pay taxes on the $6,500 automobile allowance, he could not owe a negligence penalty. Because we affirm the Tax Court's finding that Pahl failed to report the $6,500 nonemployee compensation, the penalty should not be lifted.

**1132**

IV. *Evidentiary ruling*

Pahl claims that the Tax Court admitted Exhibit "O" into evidence in violation of the "best evidence" rule, Federal Rule of Evidence 1002. Exhibit "O" is the Certificate of Amendment of Articles of Incorporation for the firm, which includes the Guarantee bearing Pahl's signature. The Tax Court overruled Pahl's "best evidence" objection at trial on the ground that Fed. R.Evid. 1003 provides "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." The court credited Niesar's testimony that he saw Pahl actually sign the Guarantee and disbelieved Pahl's testimony to the contrary. On that basis, the Tax Court obviously rejected the contention Pahl raised as to the document's authenticity and admitted the evidence under Fed.R.Evid. 901(b)(1), which provides that a document can be authenticated by the testimony of a witness with knowledge. This was not an abuse of discretion.

### CONCLUSION

The Tax Court did not clearly err in finding that Pahl was a beneficial shareholder of the law corporation, and the provisions of California law cited by Pahl do not preclude Pahl's achieving beneficial shareholder status. Thus we affirm the tax court's holding that Pahl should have reported a pro rata share of the law firm's 1990 income on his tax returns. Despite the Tax Court's finding that Pahl did not adequately explain how he accounted for the $6,500 income on his Schedule C, Pahl fails to illuminate this question on appeal. Thus, we hold the Tax Court did not err in finding that Pahl failed to report $6,500 in non-employee compensation received in 1990. Finally, the Tax Court did not err in imposing an accuracy-related penalty for negligence; nor did it abuse its discretion in admitting Ex. "O" into evidence.

AFFIRMED.