T.C. Memo. 2000-312

UNITED STATES TAX COURT

FRANK J. & ANN M. FERACO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

THOMAS M. FERACO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1759-99, 1760-99.          Filed October 3, 2000.

<u>James L. McDonald, Sr.</u>, for petitioners.

<u>Gwendolyn C. Walker</u>, for respondent.

MEMORANDUM OPINION

PAJAK, <u>Special Trial Judge</u>:  These cases have been
consolidated for trial, briefing, and opinion.  Unless otherwise
indicated, section references are to the Internal Revenue Code in
effect for the years in issue.

Respondent determined the following deficiencies in Federal income taxes and penalties:

|  | Deficiency | 6662(a) Penalty |
|---|---|---|
| Frank J. & Ann M. Feraco |  |  |
| 1993 | $5,880 | $1,176 |
| 1994 | 3,822 | 764 |
|  |  |  |
| Thomas M. Feraco |  |  |
| 1993 | $2,226 | $445 |
| 1994 | 2,058 | 412 |

This Court must decide: (1) Whether petitioners' pro rata shares of income and loss from their S corporation must be taken into account in computing their taxable income for 1993 and 1994; specifically:  Whether Frank J. and Ann M. Feraco's income should be increased by $21,006 in 1993 and by $14,218 in 1994; whether the income of Thomas M. Feraco (Thomas) should be reduced by $10,695 in 1993 and $8,091 in 1994; and whether petitioners' casualty loss in 1994 should be adjusted; (2) whether Thomas had capital gain income of $15,714 and $15,040 from distributions in excess of his basis in the S corporation during 1993 and 1994, respectively; (3) whether Thomas had additional unreported income of $1,700 in 1993; (4) whether Thomas is entitled to claim Schedule C expenses of $3,546 for 1993; (5) whether Thomas is liable for self-employment tax for 1993 and is entitled to the corresponding deduction; (6) whether petitioners are entitled to a reduction in their 1994 distributive income resulting from an amended return filed by the S corporation; and (7) whether

petitioners are liable for the accuracy-related penalties for 1993 and 1994.

Some of the facts have been stipulated and are so found. Petitioners resided in Marietta, Georgia, at the time they filed their petitions. For clarity, we have combined our findings of fact and opinion.

Petitioner Frank J. Feraco (Frank) and his son, Thomas, organized Southern Auto Brokers, Inc. (Southern Auto), a used car dealership, in 1992, as a result of Frank's desire to help his son earn some money and have a business. Southern Auto was organized as an S corporation. The Articles of Incorporation authorized Southern Auto to issue 100,000 shares of common stock. Ten shares were issued to Frank and Ann M. Feraco on June 1, 1992. (Consistent with the presentations of the parties and for simplicity, we refer to the owner of these shares as Frank.) Ten shares also were issued to Thomas on June 1, 1992. Prior to the incorporation of Southern Auto, Frank and Thomas decided that funding would come from Frank as an interest free "loan" and would be paid back when the business was capable of running on its own or at the dissolution of the business.

On August 24, 1993, a meeting was held and the shareholders agreed to appoint Bob Butler (Bob) to the Board of Directors and make him Vice President of Southern Auto. The Minutes stated:

It was also agreed to issue 10 shares of common stock at a par value of $.001 per share to Bob Butler effective September 1, 1993. This would result in a three way ownership of the three stockholders each owning a third of the business. Also Bob Butler would loan over time, $25,000 interest free to the business. For the remainder of 1993 Bob would share any Profit/Loss on a pro rata basis (One Third).

No stock certificate was issued to Bob. Bob "loaned" Southern Auto $10,000, but did not "loan" the remaining $15,000 to Southern Auto.

Frank believed that initially Bob was able to handle the responsibilities that he had at Southern Auto. However, within a year Bob's performance became unsatisfactory. Among other things, Bob often failed to lock up the building, did sloppy paperwork, and neglected to comply with sales requirements and keep records. Bob's performance never improved.

On January 9 and 10, 1995, Frank and Thomas, and Bob, respectively, signed a Termination of Stock Purchase and/or Stock Option Agreement between Southern Auto and Bob. None of Southern Auto's employees signed such an agreement. The agreement states in relevant part:

> WHEREAS, on or about August 24, 1993, the Corporation and Butler entered into an agreement in the nature of a stock purchase and/or stock option agreement ("Stock Purchase Agreement") by which Butler was to receive ten shares of common stock (one-third of the total thirty shares of common stock) of Corporation and, in consideration thereof, was to make an interest-free loan to the Corporation, over time, in the amount of Twenty-Five Thousand Dollars ($25,000.00); and * * *

WHEREAS, Butler has, to date, loaned only a portion of the total loan commitment, that portion loaned being Ten Thousand Dollars ($10,000.00); and

WHEREAS, Butler has not been given any certificates of stock and, in fact, no transfer of stock to Butler has occurred; and * * *

WHEREAS, the Corporation and Butler believe that it is in the best interest of the Corporation and Butler to terminate said Stock Purchase Agreement effective immediately;

NOW THEREFORE, IT IS AGREED AS FOLLOWS:

1. TERMINATION DATE: The aforementioned Stock Purchase Agreement is hereby terminated effective immediately.

2. RELINQUISHMENT OF INTEREST: For valuable consideration, the receipt of which is hereby acknowledged, Butler hereby assigns, transfers, and conveys to the Corporation all of his right, title, or interest in said Corporation, along with all of his right or option to purchase or receive common stock of the Corporation.

3. REFUND OF STOCK PURCHASE PRICE: In consideration whereof, the Corporation shall contemporaneously refund to Butler, the receipt of which is hereby acknowledged that portion of his loan to the Corporation which has been received by the Corporation to date, in the amount of Ten Thousand Dollars ($10,000.00) with no interest to be paid; and will pay all commissions due and owing to Butler for the month of December of 1994.

As set forth in the August 24, 1993, Minutes of Southern Auto, prior to the termination of the stock purchase agreement, Frank, Thomas, and Bob, were to share any profit or loss of Southern Auto on a pro rata basis, one-third each.

At trial, Frank claimed this agreement to share profits meant they shared the gross profit on the cars, one-third each as

commission.  The gross profit from the cars was allegedly determined after the expenses attributable to the cars were paid, which included commissions paid to salespersons, but before payment of expenses such as building expenses, rent, and salaries of the administrative staff.  Frank further testified that after all expenses of the business were paid, the net profit would be split by the shareholders.  At trial, Frank claimed the shareholders in 1993 and 1994 were Thomas and himself.

The testimony regarding the computation of the amounts paid to Frank, Thomas, and Bob, the amounts that should have been paid to each, and the number of shareholders was not consistent with the written documentation.  Further, Frank's claim that the three men split the gross profits from the sale of cars is questionable because Southern Auto's sole source of income was the sale of cars and if all car profits were divided there would be nothing left to pay the building and other administrative expenses.

In practice, Frank usually would not take his share because of Southern Auto's cash-flow problems.  He believed that Thomas and Bob should take the money because they had no other source of income to support their families.  Apparently, Thomas and Bob took money from the business as they needed it.

On Southern Auto's 1993 and 1994 tax returns, which were signed under penalty of perjury, Frank, Thomas, and Bob were listed as shareholders, with their shares of income, credits, and

deductions shown, on Schedules K-1, Shareholder's Share of Income, Credits, Deductions, etc. Thomas Doran (Doran), a C.P.A., prepared Southern Auto's tax returns for 1993 and 1994. Doran said that the owners of Southern Auto provided the information as to the percentages of stock ownership on the Schedules K-1. Frank based the percentages on the dollar amounts that each individual actually had been paid. According to an undated memo to the file signed by Frank, Thomas, and Bob, "the corporation profits would be dispersed to the shareholders (Tom, Bob, and [Frank]) based upon the actual dollars received as a percentage of the total." This method of allocation was presented to two accountants, at least one of whom was a Certified Public Accountant, who told petitioners it was acceptable to allocate the profit based on dollars received as a percentage of the total dollars distributed.

According to Southern Auto's records, cash distributions to Frank, Thomas, and Bob totaled $82,668 in 1993. Southern Auto's distributive ordinary income as reported on the 1993 return was $57,638. According to Southern Auto's records, cash distributions to Frank, Thomas, and Bob totaled $135,529 in 1994. Southern Auto's distributive ordinary income as reported on the 1994 return was $140,310.

The breakdown of the recorded cash distributions is set forth under the heading of cash withdrawals. The percentage

derived from distributions received over total distributions is set forth under the heading of percentages.  The amounts reported on the Schedules K-1 (based on a multiplication of the percentages times net earnings) are set forth under the heading of income reported.  The income reported was reported on petitioners' individual income tax returns.

### 1993

|  | Frank | Thomas | Bob | Totals |
|---|---|---|---|---|
| Cash withdrawals | $6,000 | $52,386 | $24,282 | $82,668 |
| Percentages | 8.0% | 63.0% | 29.0% | 100% |
| Income reported | $4,611 | $36,312 | $16,715 | $57,638 |

### 1994

|  | Frank | Thomas | Bob | Totals |
|---|---|---|---|---|
| Cash withdrawals | $29,000 | $54,341 | $52,188 | $135,529 |
| Percentages | 23.2% | 39.1% | 37.7% | 100.0% |
| Income reported | $32,552 | $54,861 | $52,897 | $140,310 |

Southern Auto had a casualty loss of $5,594 in 1994, which petitioners again divided based on the percentages of actual distributions they received.

Respondent's position is that the division of income should be based on each individual's pro rata share of stock with the result that income is increased or decreased in rounded numbers as follows:

### 1993

| | Frank | Thomas | Bob | Total |
|---|---|---|---|---|
| Owner: | full year | full year | as of 9/1/93 | |
| ½ share Jan.-Aug. | $19,213 | $19,213 | $ 0 | $38,425* |
| 1/3 share Sept.-Dec. | 6,404 | 6,404 | 6,404 | 19,213 |
| Income | $25,617 | $25,617 | $ 6,404 | $57,638 |
| Less income reported | (4,611) | (36,312) | | *$1.00 difference due to rounding |
| Increase/ decrease | $21,006 | ($10,695) | | |

### 1994

| | Frank | Thomas | Bob | Total |
|---|---|---|---|---|
| Owner: | full year | full year | full year | |
| 1/3 share Jan.-Dec. | $46,770 | $46,770 | $46,770 | $140,310 |
| Income | $46,770 | $46,770 | $46,770 | $140,310 |
| Less income reported | (32,552) | (54,861) | | |
| Increase/ decrease | $14,218 | ($8,091) | | |

For 1994, Frank reported a casualty loss of $1,298 and Thomas reported a casualty loss of $2,187. In the notices of deficiency, respondent determined that the casualty losses were to be adjusted.

Southern Auto filed an amended return for 1994 restating the gross receipts. Doran, who prepared the return, believed the 1994 gross receipts had been overstated. A statement attached to the amended return claims that "as a result of a prior year IRS examination; A/R of $20,180 were included in 1993 income. Subsequently, the actual collection of the same $20,180 occurred in 1994 and was erroneously included in line 1 of gross sales." We observe that both the original return and the amended return were reported on the modified accrual basis. Based on amended Schedules K-1 from Southern Auto, petitioners filed amended returns and claims for refunds. Respondent rejected petitioners' claims for refund.

Respondent determined that Thomas received $15,714 and $15,040 of capital gain income as the result of distributions from Southern Auto in excess of his basis during 1993 and 1994, respectively.

Respondent also determined that in 1993 Thomas had $1,700 of unreported Schedule C income based on a bank deposits analysis. In 1993, Thomas was going through a divorce. He had six different checking accounts, and his wife was "bouncing" checks,

so he covered checks by moving money from one account to another. He claimed the $1,700 could have been a result of the transfers, but he did not identify any such transfer.

Respondent also disallowed $3,546 of expenses claimed on Thomas' Schedule C in 1993. Thomas testified that he incurred these expenses on behalf of Southern Auto. He occasionally would use his own money to have cars washed and to buy gas and parts for cars. Thomas did not ask to be reimbursed because he knew that Southern Auto had cash-flow problems.

Based on the additional Schedule C income of $1,700 and the disallowance of $3,546 of Schedule C expenses, respondent also determined that Thomas' self-employment tax should be increased by $741 and that he was entitled to an additional self-employment tax deduction of $371.

Section 61 defines gross income as all income from whatever source derived. With respect to an S corporation, section 1366(a) provides that in determining a shareholder's tax liability, there shall be taken into account the shareholder's pro rata share of the corporation's items of income and deduction. A shareholder's pro rata share of any item for any taxable year is the sum of the amounts determined by assigning an equal portion of such item to each day of the taxable year, and then by dividing that portion pro rata among the shares outstanding on such day. Sec. 1377(a)(1).

To determine whether a taxpayer is a shareholder of a corporation for Federal income tax purposes, courts look to beneficial ownership, and not merely to legal title. Pahl v. Commissioner, T.C. Memo. 1996-176, affd. 150 F.3d 1124 (9th Cir. 1998). Because courts cannot successfully conjecture as to the subjective intent of the parties when determining who had beneficial ownership, the courts must rely on the objective evidence of intent provided by the parties' overt acts. Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972). A taxpayer can own an interest in a corporation without holding any physical evidence thereof. Richardson v. Shaw, 209 U.S. 365 (1908); Bonsall v. Commissioner, 317 F.2d 61, 63 (2d Cir. 1963), affg. T.C. Memo. 1962-151.

Based on the facts of these cases, we find that Bob had beneficial ownership in and was a shareholder of Southern Auto. The August 24, 1993, Minutes of Southern Auto state that "It was also agreed to issue 10 shares of common stock at a par value of $.001 per share to Bob Butler effective September 1, 1993." Contrary to petitioners' argument, the agreement was not an option to purchase stock in the future. The stock was to be issued on September 1, 1993. Bob also agreed to "loan over time, $25,000 interest free to the business." However, the "loan" of $25,000 was not a precondition before Bob became a shareholder.

Rather, it was an entirely separate event.  Moreover, there was no specific time in which he was supposed to lend the money.

Bob was listed as a shareholder of Southern Auto on the Schedules K-1 in 1993 and 1994.  These Schedules K-1 were attached to the Forms 1120S, U.S. Income Tax Return for an S Corporation, which were signed under penalties of perjury by Frank.  Because there was no objection to such Schedules K-1 by Thomas, we find these Schedules K-1 showed that both Frank and Thomas believed Bob was a shareholder and treated him as such. Bob performed different duties than did the salespeople. Petitioners argued that Frank, Thomas, and Bob received "commissions", but Frank never sold any cars and the three of them took "commissions" on all of the sales by the salespeople. Such sharing of earnings is typical of owners, not fellow employees.  Bob's position as Vice President and his appointment to the Board of Directors are more typical of an owner than of an employee.  Cf. Pahl v. Commissioner, supra.

Petitioners stress that stock was never issued to Bob. However, as stated above, beneficial ownership, not legal title, is controlling.  Pahl v. Commissioner, supra.  Although Federal tax law controls, we note that under Georgia law, shares of stock need not be represented by certificates under section 14-2-626 of the Official Code of Georgia Annotated.  Ga. Code Ann. sec. 14-2-625(a) (1999).  Here, there were enough shares of stock of

Southern Auto to be issued to Bob, and the board of directors authorized the 10 shares of common stock to be issued on a specific date. After August 24, 1993, and until termination of the stock purchase agreement, Bob was consistently treated as if he were a shareholder.

The termination agreement states that Bob was never a shareholder, but this after-the-fact agreement, when weighed against the other facts in these cases, is not persuasive. The agreement states that it is a "Stock Purchase Agreement" and a number of references are made to the term "stock purchase" in the agreement. The agreement also states that Bob gave up all of his right, title, or interest in Southern Auto. This statement would be unnecessary if Bob were working solely for commission and had no ownership interest. We believe this is an acknowledgment that Bob was more than just an employee. Petitioners never had any of their employees sign such a contract.

Bob was treated as a shareholder, and he received the benefits of being a shareholder. We find he was a shareholder in Southern Auto for the last third of 1993 and for all of 1994. Under section 1366(a), Southern Auto's items of income, deduction, and loss must be divided pro rata among Frank, Thomas, and Bob as prescribed by section 1377(a)(1). Petitioners do not contest respondent's calculations. Accordingly, we sustain respondent's determinations as to the reallocation of Southern

Auto's income in 1993 and 1994 and the casualty loss in 1994.

Thus, we hold that Frank's income is increased by $21,006 and $14,218 in 1993 and 1994, respectively, and his casualty loss is increased by $567 in 1994. Thomas' income is reduced by $10,695 and $8,091 in 1993 and 1994, respectively, and his casualty loss should have been reduced by $322 in 1994. However, with respect to Thomas' casualty loss, respondent in the applicable notice of deficiency erroneously concluded that Thomas' "taxable income is decrease [sic] by $1,865", and compounded the error by subtracting the $1,865 from taxable income instead of reducing his casualty loss from $2,187 to $1,865 and thereby increasing taxable income by $322. In the trial memorandum, respondent first states Thomas' casualty loss should be reduced by $1,865 and then states his loss is $1,865. On brief, respondent states the adjustment should be "($1,865)", then states the loss should be increased by $1,865, and then states his loss is $1,865. Respondent is obviously confused with respect to this adjustment. In any event, we do not believe respondent has standing to raise this issue for the first time in a memorandum or on brief. Nash v. Commissioner, 31 T.C. 569, 574 (1958). Respondent did not amend the answer to increase the deficiency over that determined in the notice of deficiency. Accordingly, we sustain respondent's determination on this issue as set forth in the notice of deficiency.

Respondent determined that Thomas received $15,714 and $15,040 of capital gain income as the result of distributions from Southern Auto in excess of his basis during 1993 and 1994, respectively.  Thomas did not address this issue at trial, nor did he provide any evidence that he had a basis greater than that determined by respondent.  Section 1368(a) provides that a "distribution of property made by an S corporation with respect to its stock to which (but for this subsection) section 301(c) would apply shall be treated in the manner provided in subsection (b) or (c), whichever applies."  Southern Auto did not have any accumulated earnings and profits during 1993 and 1994.  Section 1368(b) provides that if such a distribution is made by an S corporation which has no accumulated earnings and profits, the distribution shall not be included in gross income to the extent that it does not exceed the adjusted basis of the stock, and the amount of the distribution which exceeds the adjusted basis of the stock shall be treated as gain from the sale or exchange of property.  In general, the shareholder's basis in the stock of an S corporation is increased by the shareholder's pro rata share of the corporation's income, decreased by the shareholder's pro rata share of the corporation's losses and deductions, and decreased by the amount of the distributions that are not includable in income.

In the notices of deficiency, respondent determined that Thomas received distributions from Southern Auto of $41,331 in 1993 and $59,945 in 1994. These figures are different from the figures in Southern Auto's work papers introduced into evidence at trial. One work paper indicates that in 1993 the distribution was $52,386 and another that it was $54,480. For 1994, the distribution was $54,341. On brief, respondent continues to contend that the correct figures are $41,331 and $59,945. Because petitioners did not explain or substantiate the figures in the work papers, we base our rulings on the amounts determined by respondent.

Thomas' basis at the beginning of 1993 was zero. His 1993 pro rata share of the corporation's income of $25,617 is to be added to his basis under section 1367(a)(1)(A). The distribution to Thomas was $41,331, which exceeds his adjusted basis by $15,714. The $15,714 is taxable as capital gains. Sec. 1368(b). Thomas' basis at the beginning of 1994 was zero. His 1994 pro rata share of the corporation's income of $46,770 is to be added to his basis. His adjusted basis is then reduced by $1,865 for his pro rata share of Southern Auto's casualty loss, for a total adjusted basis of $44,905. Sec. 1367(a)(2)(B). The 1994 distribution of $59,945 exceeds this adjusted basis by $15,040. The $15,040 is taxable as capital gains. Accordingly, we sustain

respondent's determination that Thomas had capital gain income which totaled $15,714 and $15,040 in 1993 and 1994, respectively.

Under section 6001, a taxpayer must maintain adequate books and records of taxable income. In the absence of adequate records, the Commissioner is authorized to reconstruct a taxpayer's income by any reasonable method that clearly reflects income. Sec. 446(b). A bank deposit is prima facie evidence of income, and the Commissioner does not need to prove a likely source of that income. Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Smith v. Commissioner, T.C. Memo. 1993-460.

Respondent determined that Thomas had $1,700 of unreported income in 1993 after an analysis of Thomas' bank deposits. Thomas claimed that the payments may have been a transfer from one of his other accounts. The burden of showing duplication is on the petitioner. Estate of Mason v. Commissioner, supra at 657-659; Zarnow v. Commissioner, 48 T.C. 213, 216 (1967). Thomas did not provide any records to support his position. Accordingly, we conclude that Thomas had $1,700 of unreported income in 1993. Respondent determined that this $1,700 was Schedule C income. Petitioner did not prove otherwise. Respondent's determination is sustained.

Section 162 provides for a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in

carrying on a trade or business. Section 62(a)(2) allows a deduction for expenses paid or incurred by the taxpayer, in connection with the performance of services as an employee, under a reimbursement or other expense allowance arrangement with his employer. Such expenses are deductible as miscellaneous itemized deductions subject to the 2-percent of adjusted gross income floor. Sec. 67.

Respondent disallowed $3,546, the total amount of expenses claimed on Thomas' 1993 Schedule C, because Thomas did not establish that the expenses were for an ordinary and necessary business purpose. The notice of deficiency stated that the "expenses are employee business expenses properly deductible as miscellaneous deductions on Schedule A; however, you did not itemize deduction[s] and the standard deduction is to your advantage". At trial, Thomas testified that the amounts were spent for car washes, gas, and parts for the cars owned by Southern Auto. These amounts properly are deductible under section 62(a)(2) as miscellaneous itemized deductions. However, Thomas did not elect to itemize on his 1993 return. Accordingly, we sustain respondent on this issue.

Because of the additional Schedule C income of $1,700 and the disallowance of $3,546 of Schedule C expenses for 1993, Thomas is liable for an increase in self-employment tax of $741

and an increase of his self-employment deduction of $371 as determined by respondent for 1993.

Southern Auto filed an amended 1994 Form 1120S, U.S. Income Tax Return for an S Corporation, to reduce its ordinary income by $20,180. Based on revised Schedules K-1 from Southern Auto, petitioners filed claims for refund. Respondent's position is that these claims for refund are meritless because there was no showing that the $20,180 actually was reported in more than 1 tax year. No evidence was presented by petitioners to prove that fact. In other words, petitioners did not establish that the amount in question was reported in more than 1 tax year. We hold that petitioners are not entitled to a reduction in their 1994 income.

Section 6662(a) provides for an accuracy-related penalty in the amount of 20 percent of the portion of an underpayment of tax attributable to, among other things, negligence or disregard of rules or regulations. Sec. 6662(a), (b)(1). Section 6664(c)(1) provides that no penalty shall be imposed if it is shown that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of an accountant may demonstrate reasonable cause and good faith. United States v.

Boyle, 469 U.S. 241, 250-151 (1985); sec. 1.6664-4(b)(1), Income
Tax Regs.

In this case, petitioners were completely inexperienced in
managing the financial affairs of a business and in operating
under the Subchapter S rules.  The Board of Directors decided
that Southern Auto's profits should be dispersed to the
stockholders (Frank, Thomas, and Bob) based upon actual dollars
received as a percentage of the total.  This allocation was then
presented to two different independent accountants, at least one
of whom was a Certified Public Accountant, who told petitioners
that this was acceptable and that the Board could allocate the
profit as a percentage of the actual distributions.  Petitioners,
pursuant to this advice, provided the accountant with the actual
allocations of the distributions and the other financial
information from Southern Auto.  We find that petitioners
reasonably relied upon the advice they received.  Petitioners had
reasonable cause and acted in good faith.  We find for

petitioners as to the penalties.

To the extent we have not addressed any of the parties' arguments, we have considered them and find them to be without merit.

<u>Decisions will be entered for respondent as to the deficiencies and for petitioners as to the penalties.</u>