T.C. Memo. 2010-105


UNITED STATES TAX COURT


ESTATE OF ROBERT C. FORTUNATO, DECEASED, ANTHONY M. FORTUNATO,
SPECIAL ADMINISTRATOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6937-07.              Filed May 12, 2010.


<u>Dennis Calo</u>, <u>Frank Agostino</u>, <u>Jeremy M. Klausner</u>, and <u>Leonard Greco</u>, for petitioner.

<u>Louis B. Jack</u>, <u>Kathleen A. Tagni</u>, and <u>Sherri Spradley Wilder</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  Respondent determined a deficiency in Federal estate tax of $11,662,737, and a section 6663 fraud penalty of $8,649,140, against the Estate of Robert C.

Fortunato.[1]  Robert C. Fortunato (sometimes Robert or decedent)
died testate on November 4, 2002, in California.  Pursuant to
Robert's will, Robert's brother, Anthony Fortunato (Anthony), was
appointed executor and sole beneficiary of Robert's estate.[2]  At
the time the petition was filed, Anthony resided in New Jersey.
The parties stipulated that appeal would be to the Court of
Appeals for the Third Circuit.

The issues for decision are:  (1) Did Robert own an interest
in one or more of a group of warehouse companies on the date of
his death, and if so (2) whether the failure to report the value
of the interest(s) on the estate's tax return was fraudulent.
The companies involved are collectively known as the St. George
warehouse companies.  The parties agree that if Robert had an
ownership interest in one or more of the St. George warehouse
companies, another trial would be held to determine the value of
that omitted interest.

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect on the date of Robert C.
Fortunato's death, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

[2]Robert's will was challenged by his daughter, with whom he
was estranged.  Robert's daughter alleged that Anthony unduly
influenced Robert in drafting the will.  The Superior Court of
California, County of Los Angeles, found that the will was valid
and admitted it to probate on July 26, 2004.

FINDINGS OF FACT

Some of the events upon which this case turns occurred 25 years ago. In many instances, witnesses describing these events gave differing accounts as to what transpired. The trial lasted nearly 3 weeks. The record is voluminous--3560 pages of testimony and more than 400 exhibits. After sifting through the record and after carefully observing each of the 25 witnesses to determine his/her credibility, we make the following findings of fact.

## I. Robert C. Fortunato

Robert C. Fortunato, whom everyone called Bobby, was born on May 30, 1942, the third of seven Fortunato children, in order: George, Lucy, Bobby, Rosemary, Linda, Anthony, and Regina.

Bobby's persona was such that he doggedly refused to back down to anyone. Such a strong-willed personality caused Bobby, as a youth, to "seek and find trouble". Twice Bobby was indicted for Robbery 1, Grand Larceny, and Assault. In 1962 he pleaded guilty to Robbery 2, a felony, and was given a suspended sentence and probation. But after again pleading guilty to Robbery 2 in 1963, Bobby was sentenced to 7-1/2 to 15 years in Sing Sing Prison. He served approximately 6 years of the sentence.

Following his release from Sing Sing Prison in 1969, Bobby went to work for Reliable Van and Storage (Reliable) as a dispatcher and its office manager. He worked there and elsewhere

until 1979 when he became a coowner and president of Container Overseas in Linden, New Jersey. Container Overseas operated a warehouse and export business.

Container Overseas became one of the largest exporting companies in the country. However, because of severe financial problems, caused in part by its employees' misappropriating company funds as well as the company's having to borrow at a high rate of interest, Container Overseas was forced to close in May 1984.

At the time of the collapse of Container Overseas, Bobby owed trust fund penalties to the Internal Revenue Service (IRS) approximating $490,000 for failure to pay over Container Overseas' withheld employee taxes. In addition Bobby owed a large amount (in the hundreds of thousands of dollars) to overseas creditors including some who allegedly belonged to the Chinese mafia.

II. Anthony Fortunato

Anthony was the youngest of the Fortunato brothers. He was 10 years younger than Bobby and 21 years younger than George.

The Fortunatos were a close-knit family, devoted and supportive of each other, and had a strong sense of Italian-American identity and tradition. The Fortunato brothers in most cases deferred to the wishes of their father, Biagio Fortunato, and the younger brothers looked up to their older brothers.

Anthony adored Bobby and often followed Bobby's lead. Anthony viewed Bobby as a visionary and believed that if he wanted to do well, he would be well advised to listen to Bobby. "When it came to business, I put nobody ahead of him", said Anthony.

But while Bobby was the "ambitious" brother, Anthony tended to be the "reliable" brother. When adversity struck, Bobby did not rise to the occasion. Thus, when Biagio Fortunato and George each died in 1990, Bobby refused to shoulder any responsibilities and Anthony became the de facto head of the Fortunato family, providing financial support to his mother and to George's family.

Anthony briefly attended college in 1972. From 1973 to 1978 he worked at Reliable, performing a variety of tasks. Anthony's first position at Reliable was that of a furniture mover, but within a short period, he began working at Reliable's container freight station (CFS) operation. A CFS' function is to receive and "break down" shipping containers imported from overseas. The freight is warehoused until it is retrieved by its recipients or forwarded to another destination. Because the cargo is from overseas sources, a CFS is considered a U.S. Customs Service bonded location and is subject to Customs Service regulations.

Anthony was in charge of the unloading and storage of the containers. He managed this operation for 2 or 3 years before reverting to his former position as a furniture mover. Although

this position change was a retrograde step in terms of responsibility, Anthony earned more money doing the simpler job because of overtime pay rules.

Upon leaving Reliable in 1978 Anthony worked in a variety of jobs, including selling insurance.  Sometime in 1984 Anthony began to work for Bobby at Container Overseas.

III.  The Establishment of St. George New Jersey

When Container Overseas closed in 1984, Bobby tried to be positive while saying good-bye to his employees.  Robert Gennuso (Gennuso), a colleague at Container Overseas, testified:  "Well, amidst hugging and that, Bobby told me that he would try to put something together and keep business going, and that I would be welcomed."

But the reality was different.  Bobby did not put anything together.  Instead, the closure of Container Overseas began a period of difficulties for Bobby, Anthony, and their families. Bobby had no money, was hiding from his creditors, and was sleeping on the couch in his parents' home.  To avoid his creditors, Bobby did not maintain a bank account and refused to sign or put his name on any document.  Bobby withdrew from the world, and even his closest friends had difficulty reaching him at times.  And Anthony had no steady job.

This state of affairs was not long tenable, and Anthony looked for new business opportunities.  Because Anthony had

experience in shipping and warehousing, he focused his attention on those industries. He consulted with numerous individuals, including his father (by profession a longshoreman and thus familiar with shipping) and brothers, all of whom believed that the shipping industry was beginning to be dominated by containerized freight and that Anthony would do well to establish a CFS to service the rising demand.

In the middle of 1984 Anthony decided that he should establish a CFS as well as a non-Customs Service bonded warehouse. George invested in these ventures with Anthony. Bobby was not asked to, and did not, become an investor.

Anthony thought that two corporations had to be formed--one to operate the CFS and one to operate the non-Customs Service bonded warehouse--and that each business had to be operated from a separate building. Therefore, in mid-to-late-1984, Anthony leased two buildings, and on February 27, 1985, he caused to be incorporated St. George Trucking & Warehousing, Inc., doing business as St. George Warehousing (St. George New Jersey), to operate the CFS, and A.R.G. Warehouse, Inc. (A.R.G.), to operate the non-Customs Service bonded warehouse. Anthony and George each acquired a 50-percent interest in each corporation. Anthony was the president, and George was the vice president, of each corporation.

For a time, St. George New Jersey and A.R.G. physically operated alongside each other. Anthony soon realized that he did not need two companies or two buildings. The operations of both companies were combined. St. George New Jersey moved to A.R.G.'s warehouse at 330 Hurst Street, and A.R.G. became dormant.

Anthony relied on others to complete all legal formalities with respect to the establishment of each corporation. He requested his accountant to issue stock certificates, but no certificates were issued.

After establishing the companies, Anthony applied for a CFS bond from the Customs Service. Gennuso joined both A.R.G. and St. George New Jersey while both companies were at 330 Hurst Street. Gennuso assisted in having St. George New Jersey become a CFS at the Hurst Street location and in acquiring the required CFS bond from the Customs Service.

IV. Early Operation of A.R.G. and St. George New Jersey

At first, St. George New Jersey and A.R.G. had little revenue or profit. Anthony divided his time between the two companies, working for a low salary. Because the companies did not have sufficient cashflow to pay George a salary, George worked elsewhere. And from time to time, Bobby acted as Anthony and George's business strategist.

George joined St. George New Jersey after it moved to a new warehouse on Stiles Street, where he worked with the truck

drivers.  Biagio Fortunato came to the warehouse every day; he worked for free.

Bobby began to work for St. George New Jersey full time and soon assumed leadership of the business.  He created the strategies that moved St. George New Jersey forward, and he "more or less [told] Anthony and George what needed to be done" to implement his strategies.  Bobby had no business title and was not on the company's payroll.

Anthony was content to remain in the background, organizing the freight in St. George New Jersey's warehouse.  However, he was the company's financial backer.  Indeed, Gennuso testified: "Anthony organized and managed very well the physical operation, and I know that he was there for the financial assistance."

V.  The Concealment of Robert C. Fortunato's Role at St. George New Jersey

Each week an employee of St. George New Jersey would write a check from the company's checking account to a fictitious person, cash the check, and then place the proceeds in the company's safe for Bobby's use.  Through such sub rosa means Bobby sidestepped Customs Service requirements that the names and fingerprints of all owners, officers, and employees of a CFS be provided to the Customs Service.  Moreover, this clandestine remuneration arrangement enabled Bobby to avoid filing Federal income tax returns or paying taxes for years.

VI.   The Expansion of St. George New Jersey

St. George New Jersey left its Hurst Street location in 1986 and moved to a larger warehouse on Stiles Street.  The larger building resulted in larger expenses, such as more rent, more cargo handling equipment, and more employees.  St. George New Jersey lacked the cashflow to meet these costs; thus, it turned to Anthony and George for the required funds.

Anthony and George lacked the necessary funds to advance to St. George New Jersey.  They turned to their parents for assistance.  In 1987 their parents transferred title to the family house in Brooklyn, New York, on which there was no mortgage, to Anthony and George.  Thereafter, Anthony and George used the house as collateral to obtain a $100,000 bank loan.  The loan proceeds were then lent to St. George New Jersey.  When George died in 1990, George's interest in the house was conveyed to Anthony who then paid off the loan.

But even with the loan proceeds, St. George New Jersey struggled.  St. George New Jersey lost its biggest account, and the company was constantly behind on its warehouse rent payments.  By 1989 the company was failing and had nearly gone out of business.  Anthony then began doing sales work.  He procured several new accounts, including one worth more than $1 million.

The Stiles Street warehouse was not large enough to handle the additional business.  Anthony met with the landlord, seeking

to terminate the company's lease.  Anthony informed the landlord that if St. George New Jersey stayed at Stiles Street, the company would either "always be lagging behind" or, worse, might go out of business.  Although St. George New Jersey owed $700,000 in rent, the landlord agreed to a buyout arrangement whereby St. George New Jersey would be released from its lease and rental obligation by paying the landlord $300,000 in installments of $10,000 each over 30 months.  Anthony was required to pledge his home as collateral.  Ultimately, the $300,000 due the landlord was paid.

St. George New Jersey moved into a new and larger warehouse. With its new accounts, St. George New Jersey became financially stable.  However, it still required, from time to time, infusions of capital.  At an unspecified date between 2001 and 2005 St. George New Jersey obtained a bank loan which Anthony personally guaranteed.

VII.  The Establishment of St. George California

At the same time Anthony undertook the responsibility to rescue St. George New Jersey, Bobby was thinking about other matters.  Bobby knew that clients of St. George New Jersey were forwarding a substantial amount of freight through California. He saw this as an opportunity to expand St. George's business by establishing a hub in California to service these clients.  Bobby recognized that by establishing a CFS in California and by having

freight shipped to the California CFS, St. George New Jersey could charge loading, transport, unloading, and storage fees at both the New Jersey and California locations.  Bobby further realized that once ensconced on the West Coast, St. George New Jersey would be well positioned to exploit the ever-increasing volume of goods being imported from the Far East.

Soon after Anthony stabilized St. George New Jersey's finances, he, Bobby, and Gennuso each traveled to the West Coast to investigate establishing a California presence.  Many of St. George New Jersey's clients had offices in Los Angeles, and Anthony visited them in an attempt to persuade them to use St. George New Jersey for their CFS and warehousing needs in California.

Because St. George New Jersey did not have the capital to establish a new warehouse in California, Bobby approached individuals with whom he had prior business dealings, namely, the Molfetta brothers (Michael, Frank, and Robert Molfetta), Raymond Robinson, Anthony Casinelli, and Richard Baddini to provide capital to establish the new California warehouse.[3]  Because

---

[3]The Molfetta brothers and Robinson, Casinelli, and Baddini all agreed to invest in the venture.  However, Robinson encountered financial problems within a year of the establishment of St. George California and thereafter sold his interest to Anthony and the Molfetta brothers.  Baddini and Casinelli provided some capital, but did not participate in the business as much as had been hoped, and soon left.  No stock certificates were ever issued to these individuals.

Bobby was involved in this endeavour, the Molfetta brothers agreed to buy stock in the new company. As Michael Molfetta testified: "Bobby was the guy that we knew could make things happen with the right team." The Molfettas (through their family corporation, Tribro, Inc.) invested $100,000 in the venture. Anthony invested a similar amount, obtaining the funds from St. George New Jersey. St. George Warehouse and Trucking Co. of California, Inc. (St. George California), was incorporated on November 30, 1989.

St. George California leased a warehouse and applied for a CFS bond with the Customs Service. Bobby's name was not listed in the bond application.

Periodically, Anthony and the Molfetta brothers lent money to St. George California. St. George California also borrowed money from commercial lenders and periodically leased equipment. Whenever personal guaranties were required, Anthony would guarantee the loan or lease.

VIII.  Robert C. Fortunato's Hidden Management of St. George California

While at St. George New Jersey, Bobby set up the St. George California operations. He selected Lou Des Lauriers (Des Lauriers) to be the company's general manager, and Des Lauriers took his orders from Bobby, who remained in New Jersey.

At first, St. George California struggled. Its business was not operating properly. Bobby flew out to California to take

charge. He quickly fixed the various problems. Bobby enjoyed the southern California lifestyle and decided to remain there permanently. Des Lauriers remained at St. George California as Bobby's right-hand man.

As at St. George New Jersey, Bobby held no title at St. George California. He was not an officer and was never mentioned in any submission that St. George California made to the Customs Service.

As in New Jersey, in California Bobby hid from his creditors, fearful that they would discover him, maintained no bank account, and refused to sign his name on any document. Indeed, Des Lauriers described Bobby as a "non-person".

Anthony was the president of St. George California. He was ensconced in New Jersey and did not direct the overall operations of St. George California. Rather, Bobby ran St. George California as he saw fit. In Anthony's words, Bobby had "carte blanche" with respect to St. George California and its subsidiaries. Ultimately Bobby began to refer to himself as the "CEO" or the "owner" of St. George California to many of its customers and vendors, especially when they preferred to deal directly with the company's owner.

IX. <u>Robert C. Fortunato's Compensation From St. George California</u>

Upon joining St. George California, Bobby continued his clandestine remuneration scheme. However, Bobby eventually filed

Federal income tax returns to take advantage of an IRS amnesty in the early 1990s and to bring himself into the tax system. But Bobby did not report all the income he earned. Rather, he reported $30,000 per year, when in reality he was receiving between $200,000 and $1.2 million a year from St. George California and other St. George warehouse companies.

Bobby was by far the most highly compensated person at St. George California. Payments to him were recorded in the company's financial records by Jorge Cruet (Cruet), the chief financial officer, as "officer salary", "professional fees", or "notes payable stockholders." These classifications were made because Cruet believed Bobby to be the owner of St. George California. Cruet, however, did not see any documentation to substantiate this belief.

X.   Robert C. Fortunato's Personal Expenses Paid by St. George California

Bobby enjoyed an expensive lifestyle. Once he established himself at the helm of St. George California, he used the resources of the company as his own. St. George California paid all the expenses for Bobby's house and automobile. Additionally, St. George California paid entertainment expenses of Bobby and his retinue. Anthony was aware of Bobby's use of the company's funds, but Anthony did not care. Bobby was his brother and, as long as St. George California was a success, Anthony wanted to leave it alone.

XI.  The Establishment of St. George Georgia

Both St. George California and St. George New Jersey shipped a substantial amount of freight through Atlanta, Georgia.  Des Lauriers was familiar with William Dillard (Dillard), who owned a struggling warehouse in Atlanta and who was interested in participating in a business venture.  Des Lauriers brought the opportunity to acquire Dillard's company to Bobby's attention, and Bobby sent an employee to visit Dillard.

In 1995 Anthony traveled to Atlanta and met with Dillard. After discussing the matter with Bobby, Anthony agreed to go into business with Dillard.  Des Lauriers handled the establishment of the new company.  The Molfetta brothers were not consulted, although they ultimately acquired an interest in the Atlanta warehouse.

On May 26, 1995, St. George Warehouse Co. of Georgia, Inc. (St. George Georgia), was incorporated. St. George Georgia operated as both a CFS and a general warehouse.  Dillard reported to Bobby, speaking with him via telephone.

XII.  The Establishment of Other St. George Warehouses

St. George California established several subsidiaries that operated warehouses in other cities.  Warehouses were established in Chicago, Dallas, Houston, Charleston, South Carolina, and Miami (although the Miami warehouse soon closed).

St. George California was the hub of the entire operation.  The general managers of all the subsidiaries reported to Bobby.

XIII.   The Establishment of the St. George Trucking Companies

Bobby individually established and owned three trucking companies to service some of the needs of the St. George warehouse companies:  St. George Express, Ltd., St. George Express USA, Inc., and St. George Express Texas, Inc.  The St. George trucking companies had no office space of their own; rather, they operated out of St. George California office space.

The St. George trucking companies transported freight for the St. George warehouse companies.  All their revenue came from St. George California.  When Bobby discovered that the St. George trucking companies were earning a substantial profit, he directed that they reduce the amount they charged St. George California so that their revenues and income would be a "wash".

XIV.   The Redemption of the Molfetta Brother's Interests in St. George California

Two of St. George California's warehouses, both of which were leased from Prentiss Properties (Prentiss), suffered considerable damage in a storm.  The freight stored in these warehouses was damaged.  As a result, St. George California decided to break its leases, which led to a lawsuit.  Eventually Prentiss made a settlement offer which would have allowed St. George California to terminate the leases.  Discussions between Bobby, Anthony, and each of the Molfetta brothers were held with

regard to whether the settlement offer should be accepted. Bobby and Michael Molfetta wanted to accept the offer while Anthony, Frank Molfetta, and Robert Molfetta did not. Consequently, St. George California declined the settlement offer.

Bobby was furious. Although he eventually forgave Anthony for not siding with him, his relationship with the Molfetta brothers was poisoned. After St. George California lost the lawsuit in part because Frank Molfetta improvidently signed a document that waived certain rights, Bobby and Anthony felt that the Molfettas could no longer participate in St. George California's business. Consequently, Anthony negotiated with Frank Molfetta with regard to St. George California's redeeming the Molfettas' stock.

Pursuant to the terms of a redemption agreement (concluded in 1997), each of the Molfetta brothers received approximately $1.5 million in deferred payments.[4] The Molfettas required both Bobby and Anthony to guarantee the corporation's obligation. The Molfettas insisted on Bobby's guaranty to ensure he remained working at the company, believing that "if Bobby goes, the company goes."

---

[4]As part of the agreement, the Molfettas' shares in St. George Georgia were also redeemed.

XV.  The Attempted Sale to Edward O'Donnell

In 2000 Anthony started to consider selling St. George New Jersey.  Bobby offered to pay Anthony $1 million to "forget to sell the company" and to "work easy" (i.e., stay away from the operations of the St. George warehouse companies).  However, Anthony was adamant.  He approached John Ruse (Ruse), a partner at Dictor Capital, a private mergers and acquisitions firm with broad experience in selling small-to-mid-sized businesses, to market St. George New Jersey.[5]  As negotiations developed with a potential buyer (Edward O'Donnell, see infra p. 21), Anthony agreed that all of the St. George warehouse companies would be included in any sale.

Ruse examined the financial information and other background materials of all the St. George warehouse companies.  Ruse drafted a marketing document (the Confidential Business Review or CBR).  The CBR was essentially a sales pitch.  Ruse testified:

> But my direction in creating this document was to create a document that described how the business ran.  It was not to create a [sic] asset purchase agreement to legally specify every asset being sold and the exact ownership of every piece of property et cetera.  I just wanted to make that clear.

The CBR included information on all the St. George warehouse companies, specifically the nature of the industry, the structure

---

[5]Ruse had marketed 80 to 100 businesses while with Dictor Capital, succeeding in selling 25 to 30 businesses.

of the companies, their facilities, revenue streams, customers, competition, and finances.  The CBR contained the following:

> the current President and his brother started the Company in the Metro New York area.  In 1989 they expanded operations to the West Coast, setting up operations in the Long Beach area.  The President's brother started the Long Beach CFS facility and continues to actively manage West Coast Operations.

When Ruse initially met Anthony, Anthony told him that he was the sole owner of the St. George companies.  Ruse did not verify that statement because he did not believe the identity of the owner of the St. George Companies to be of significance in marketing the business.  As far as Ruse was concerned:

> You know, you had Anthony who was the president and 100 percent owner and shareholder of it, but he never told me any different than the fact that Robert was with him from the beginning and Robert was a substantial officer and partner with him in this thing and so that, you know, they worked together.  But it has always been my understanding that Anthony was the sole shareholder.

Although Ruse referred to Anthony and Bobby as "partners" in the St. George business, Ruse "did not mean, you know that he [Bobby] was an equity partner, just they're a partner in a business."

A statement in the CBR read:  "Our Client's operations are run through a series of companies that for accounting and tax purposes are separate C-Corporations with common ownership".  Ruse testified that he intended that statement to convey his belief that Anthony owned 100 percent of the St. George warehouse

companies, not that Anthony and Bobby each held a 50-percent interest in each warehouse company.

As noted supra p. 19, Anthony initially desired to sell only St. George New Jersey. Ruse's initial marketing materials referred only to the business of that company. Ruse ran an advertisement in the Wall Street Journal advertising a "Niche Logistics Company". The only serious response came from Edward O'Donnell (O'Donnell). When O'Donnell learned that St. George New Jersey was affiliated with a nationwide chain of warehouse and trucking companies, O'Donnell informed Anthony and Ruse that he would be interested only in acquiring all the St. George companies as an integrated operation. Anthony told O'Donnell that he would have to speak to Bobby before agreeing to such a proposal.

Bobby initially was opposed to selling the business, but by the fall of 2000 Anthony prevailed upon Bobby to accept the idea of putting the entire group of St. George warehouse and trucking companies up for sale.

Bobby, along with Anthony and Ruse, met with O'Donnell around the end of 2000. Bobby agreed to consider, but not commit to, the proposal. Bobby remained ambivalent throughout all the discussions, once saying: "What would I do with all the money?"

O'Donnell made an oral proposal to buy all the St. George companies for $30 million. The amount proposed was intended to

be a discussion amount that would set in motion the due diligence process.  O'Donnell let it be known that were he to purchase the companies, Bobby would have to remain and agree to operate St. George California.

Bobby, Anthony, and Cruet discussed the idea.  Anthony favored going forward with the proposal, while Bobby did not.  Because O'Donnell wanted Bobby to remain with the company after the sale, Bobby's approval was vital.

Bobby did not like O'Donnell, and he did not want to work for him.  Other St. George California employees felt the same way.  Even beyond that, St. George California was Bobby's life, and he wanted to continue to run the company without supervision, something he would be unable to do were O'Donnell to become the owner.  Because Bobby declined to remain at St. George California after a sale, O'Donnell's oral proposal was withdrawn.

As part of his pursuit to buy the St. George companies, O'Donnell and his attorney, Peter Ehrenberg (Ehrenberg), composed several draft letters of intent.  Drafts were first addressed to Bobby and Anthony, then to Anthony and Bobby, then to just Anthony and then again to Anthony and Bobby.  The addressees of the drafts of the letter of intent changed constantly because neither O'Donnell nor Ehrenberg knew who actually owned the St. George warehouse companies.  Inasmuch as the possible acquisition was in the preliminary stage, neither O'Donnell nor Ehrenberg

performed due diligence with respect to the St. George Companies, and neither O'Donnell nor Ehrenberg examined the legal documents of the St. George warehouse companies. O'Donnell believed that Anthony and Bobby shared responsibility for operating the St. George warehouse companies, and he was concerned that by leaving either Anthony's or Bobby's name off the letter of intent, or even by putting their names in the wrong order, he might cause the deal to fail.

XVI. <u>The St. George Warehouse Companies After the O'Donnell Sale Discussions</u>

After the possible sale to O'Donnell fell through, Anthony proposed selling the St. George warehouse companies to an ESOP (employee stock ownership plan). Being unable to convince Bobby to agree to such a sale, Anthony withdrew his proposal.

In 2002, Bobby changed his mind about keeping his role at the St. George warehouse companies hidden and contacted St. George California's banker, inquiring as to the possibility of raising $10 to $20 million for "buying out" Anthony. Bobby died before he could formally approach Anthony with respect to such a buyout proposal.

OPINION

I. <u>Introduction</u>

The Federal estate tax is imposed on the value of the decedent's taxable estate with specified adjustments. Sec. 2001(b). The value of the decedent's taxable estate is the value

of the decedent's gross estate less enumerated deductions. Sec. 2051. The value of the decedent's gross estate includes the value of all of the decedent's property to the extent provided under sections 2031 through 2046.

Section 2031(a) provides that "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." Section 2033 provides that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." This includes "the value of all property, whether real or personal, tangible or intangible, and wherever situated, beneficially owned by the decedent at the time of his death." Sec. 20.2033-1(a), Estate Tax Regs.

II. Contention of the Parties

The issue involved in this case is one of fact; i.e, whether Robert C. Fortunato had an ownership interest in the St. George warehouse companies at the time of his death. Not surprisingly, respondent maintains he did; petitioner maintains he did not.

Respondent asserts that Bobby founded and coowned the St. George warehouse companies with his brothers Anthony and George. In that vein, respondent posits that Bobby, because of his past problems (i.e., the felony convictions, tax liens, and creditor

issues), believed he had to conceal his ownership interest in the St. George warehouse companies to avoid problems with the Customs Service, the IRS, and his creditors. Respondent readily acknowledges that no stock certificates were issued to Bobby. Nonetheless, respondent contends that the manner in which the companies operated indicated that Bobby held either an uncertificated or beneficial ownership interest in the St. George warehouse companies. Respondent asserts that Bobby was "the boss"; that he developed the business strategy for the companies; that the employees of the companies reported to him; that he controlled the finances of the companies (including using the companies' coffers as his personal "piggy bank"); and that on occasion he held himself out to the customers and vendors of the companies as the owner in his dealings with them. Thus, respondent maintains, and asks us to conclude, that on the date of his death, Bobby owned a 50-percent interest in St. George New Jersey, a 50-percent interest in St. George California, and a 25-percent interest in St. George Georgia.

The estate maintains that because of Bobby's past problems, Bobby did not intend to own, and at no time owned, an interest in the St. George warehouse companies. The estate concedes that Bobby developed the business strategy for the St. George warehouse companies and that the employees of the companies

reported to him, but it counters that Bobby was handsomely paid for his services.

III.  Applicable Law

To determine a decedent's interest in property, we look to State law.  "State law, which creates legal interests and rights in property, including powers of appointment, determines the nature, scope, and validity of such legal interests and rights." Estate of Posner v. Commissioner, T.C. Memo. 2004-112.  The Supreme Court has stated:

> State law creates legal interests and rights.  The federal revenue acts designate what interests or rights, so created, shall be taxed.  Our duty is to ascertain the meaning of the words used to specify the thing taxed.  If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law.

Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940) (fn. ref. omitted).

Thus, Morgan stands for the proposition that if we determine that State law creates a property interest or a right thereto, we are not necessarily bound by the formalities of State law; we may look through to the substance.  For example, in McCue v. Commissioner, a Memorandum Opinion of this Court dated Mar. 4, 1946, we stated in the context of determining whether a decedent held a beneficial ownership interest in a parcel of real property:

It will be seen that the title to the lot and house was in the McCues [name] from the beginning, and the only question is whether they were bought with Nolan's [the decedent] money on his behalf and, in fact, were beneficially owned by him at death. In tax cases we deal with the realities of a situation and not with the formalities of title, and although a recorded legal title to land creates a prima facie presumption of ownership in the title holder, that presumption may be overcome by evidence showing that the real or equitable ownership lies elsewhere. And if the evidence indicates that this is so, we are not concerned in a tax case with the niceties of chancery doctrine upon resulting or constructive trusts.

IV. Robert C. Fortunato Did Not Hold an Ownership Interest in the St. George Warehouse Companies

"'[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed-- the actual benefit for which the tax is paid.'" Frank Lyon Co. v. United States, 435 U.S. 561, 572 (1978) (quoting Corliss v. Bowers, 281 U.S. 376, 378 (1930)). Thus, for tax purposes, courts have held that an individual may be deemed to own stock in a corporation where he/she has a beneficial ownership in the corporation even if no stock certificate was issued. See Pahl v. Commissioner, 150 F.3d 1124 (9th Cir. 1998), affg. T.C. Memo. 1996-176.

New Jersey, California, and Georgia courts all have held that stock certificates are merely evidence, not determinative, of shareholder status, and that a legal owner of a corporation may be an uncertificated shareholder. See Pac. Fruit Co. v. Coon, 40 P. 542, 544 (Cal. 1895) ("it is quite as well settled that the issuance of a certificate of corporate stock is not a

necessary preliminary to ownership or assessability of such stock."); <u>Fulgam v. Macon & Brunswick R.R. Co.</u>, 44 Ga. 597, 598 (1872) ("The certificate of stock is only the evidence of his right. He would be a full stockholder, with all the rights of one, if the certificate was not issued at all."); <u>Abraham v. Twp. of Teaneck Ethics Bd.</u>, 793 A.2d 805, 809 (N.J. Super. Ct. App. Div. 2002) ("stock certificates are, however, only evidence of shareholder status; their physical possession is not a prerequisite to the formation of the corporate relationship or ownership in the company.").

In determining whether an individual has beneficial ownership in a corporation, we look to the facts and surrounding circumstances to determine whether the putative shareholder exhibits an intent to become a shareholder and concomitantly whether the corporation exhibits an intent to make the putative shareholder an owner. "'Since courts cannot successfully conjecture as to the subjective intent of the parties, the objective evidence of intent provided by the parties' overt acts must be relied upon.'" <u>Pahl v. Commissioner</u>, T.C. Memo. 1996-176 (quoting <u>Pac. Coast Music Jobbers, Inc. v. Commissioner</u>, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972).

Respondent asserts that, as a matter of State law, because Bobby "played a key role in forming the original St. George warehouse entities, * * * he would have been entitled to stock in

these entities." Respondent's "right to stock" theory is founded on the following New Jersey, California, and Georgia statutes which provide that rendering services may constitute consideration for stock.

N.J. Stat. Ann. sec. 14A:7-5(1) (West 1973) provides:

> Subject to any restrictions contained in the certificate of incorporation, the consideration for the issuance of shares may be paid, in whole or in part, in * * * (d) labor or services actually performed for the corporation or in its formation * * *

Cal. Corp. Code sec. 409(a)(1) (West 1986) provides that shares may be issued:

> For such consideration as is determined from time to time by the board, or by the shareholders if the articles so provide, consisting of any or all of the following: * * * services actually rendered to the corporation or for its benefit or in its formation or reorganization; * * *

Ga. Code Ann. sec. 14-2-621(b) (West 1993) provides:

> The board of directors may authorize shares to be issued for consideration consisting of any tangible or intangible property or benefit to the corporation, including * * * services performed, * * *

Respondent cites numerous cases in support of his position. But in each of these cases the putative shareholder (1) had an intent (at least at one time) to become a shareholder, and (2) took action to follow through on that intent, usually through the contribution of cash or property to acquire the ownership interest. Additionally, in each case respondent cites, there was evidence that the corporation intended to make the putative shareholder an owner.

One of the cases respondent cites is <u>Lask v. Bedell, Inc.</u>, 109 A. 849 (N.J. Ch. 1919), affd. 111 A. 926 (N.J. 1920). In that case, Lask lent $2,000 to Corcoran to enable Corcoran to acquire shares of stock in Bedell, Inc. The loan was evidenced by a note. Corcoran purchased the stock and assigned a 50-percent interest in his Bedell, Inc. stockholdings to Lask as collateral. Stock certificates evidencing Corcoran's interest in Bedell, Inc., were prepared, but never delivered, even though Bedell, Inc., recognized Corcoran as a stockholder. Corcoran later disappeared for reasons not herein relevant, but not before writing a letter to Lask to which was attached an assignment of Corcoran's stockholdings in Bedell, Inc., to Lask. When Bedell, Inc., refused to honor the assignment, claiming that Corcoran was never a valid shareholder, Lask sued Bedell, Inc., requesting the court to compel Bedell, Inc., to issue to him the stock owned by Corcoran. The court found that Corcoran was a shareholder of Bedell, Inc., and the assignment of Corcoran's stock to Lask to be valid.

Another case respondent cites is <u>Pahl v. Commissioner</u>, 150 F.3d 1124 (9th Cir. 1998), wherein the Court of Appeals for the Ninth Circuit upheld this Court's determination that Pahl (1) was a shareholder in a law firm which was an S corporation and (2) should have reported a pro rata share of the law firm's 1990 income on his individual tax returns. In reaching its decision,

the court found: (1) Pahl agreed with the law firm to become a 25-percent shareholder of the law firm as of August 9, 1989, by agreeing to purchase stock for 25 percent of the audited book value of the firm as of July 31, 1989, (2) Pahl did not pay the amount called for in his agreement with the law firm, and (3) the law firm did not issue stock to Pahl.

After Pahl joined the firm, he became disenchanted; and by May 1990 he informed the other shareholders that he was separating from the firm effective June 30, 1990. As part of Pahl's withdrawal from the firm, it was agreed that Pahl would pay the firm $8,000 and assume both the balance outstanding on the firm's line of credit (which Pahl had negotiated) and certain other firm obligations in exchange for Pahl's receiving the firm's furniture and equipment and accounts receivable.

Lask, Paul, and each of the other cases respondent cites are distinguishable from the instant case in that in each case there was objective evidence, as demonstrated by the parties' overt acts, whereas here there is not, to show that (1) the putative shareholder intended to acquire an ownership interest in the corporation, and (2) the corporation intended the putative shareholder to become an owner. See, e.g., LiButti v. United States, 107 F.3d 110 (2d Cir. 1997); Shades Ridge Holding Co. v. United States, 888 F.2d 725 (11th Cir. 1989); F.P.P. Enters. v. United States, 830 F.2d 114 (8th Cir. 1987); United States v.

Secapure, 101 AFTR 2d 2008-1495, 2008-1 USTC par. 50,277 (N.D. Cal. 2008); Hansen v. Bear Film Co., 168 P.2d 946 (Cal. 1946); Pac. Fruit Co. v. Coon, 40 P. 542 (Cal. 1895); Sumner v. Flowers, 279 P.2d 772 (Cal. Ct. App. 1955); Meyer & Holler v. Ramona Village, 43 P.2d 823 (Cal. Ct. App. 1935); Harrell v. Harrell, 290 S.E.2d 906 (Ga. 1982); Fulgam v. Macon & Brunswick R.R. Co., 44 Ga. 597 (1872); Kueffer Crane & Hoist Serv., Inc. v. Passarella, 543 S.E.2d 113 (Ga. Ct. App. 2000); Haas v. Koskey, 226 S.E.2d 279 (Ga. Ct. App. 1976); Abraham v. Twp. of Teaneck Ethics Bd., 793 A.2d 805 (N.J. Super. Ct. App. Div. 2002).

The record reveals that Bobby never desired or intended to be a shareholder of the St. George warehouse companies because (1) he was fearful that if his creditors were aware of any assets owned by him, they would attempt (forcibly or otherwise) to collect the debt, and (2) he was worried that his past criminal convictions would stigmatize any company in which he had an ownership interest.

Bobby had no financial reason to be a shareholder. Bobby was given carte blanche use of the St. George warehouse companies coffers, which enabled him to enjoy a quality of life many would envy. Moreover, Bobby had no need to accumulate wealth to pass on to others upon his death. He had no spouse and was estranged from his children. The sole object of Bobby's bounty was Anthony who already owned the St. George warehouse companies.

Bobby had none of the financial burdens associated with equity ownership.  He never made, nor was he ever asked to make, any contributions or loans to the companies or guaranteed any of their debts.  Bobby had no risk of loss.  He had no capital at risk and, should the corporate veil ever be pierced, he would have no personal liability.  Having been a coowner of Container Overseas, Bobby experienced the problems associated with being an owner of a business, and we believe he did not wish to repeat that experience.

Respondent's cavalier assertion that "Bobby would not have spent the rest of his life struggling to grow a business and working to make [the St. George warehouse companies] a success unless he was an equity owner" is unsupported speculation on respondent's part, which we reject.

From Anthony's perspective, Bobby was irresponsible, and Anthony saw firsthand how poorly Bobby dealt with setbacks. Although Anthony gave Bobby carte blanche over St. George California's operations, we think he did so because of his belief that when it came to business canniness, Bobby was the best.  But we are not willing to equate Bobby's leadership ability and his knack for finding and exploiting business opportunities with Bobby's having a property right (i.e., ownership interest) in the St. George warehouse companies.

Bobby was a take-charge person and had strong managerial skills. Because of Bobby's leadership role, many of Bobby's colleagues assumed he had to be a co-owner. In this regard, we are mindful that one of respondent's witnesses, Janet Des Ruisseau, testified that on the basis of her observations of Bobby's dealings with Angelo Carrera (Carrera), a close friend of Bobby's, she assumed Bobby and Carrera coowned a company called Container Innovations. But her assumption was wrong, for Carrera testified:

> Q [by Dennis Calo]: * * * Janet Des Ruisseau testified previously that Bobby Fortunato was your partner in Container Innovations, a company that you started?
>
> A: Yes
>
> Q: And your answer to me was that after what he did at Container Overseas, I wouldn't let him near my business, correct?
>
> A: That's absolutely correct, and he knew that from the get-go.
>
> THE COURT: So he wasn't your partner?
>
> THE WITNESS: No. No, and he knew that, that I wouldn't let him near my business.

We believe those who assumed Bobby was a co-owner of the St. George warehouse companies were as wrong as Janet Des Ruisseau in their assumption.

Respondent argues that Bobby's involvement in the failed sale of the St. George warehouse companies to O'Donnell evidences Bobby's equity ownership. We disagree. O'Donnell stated that

since he deemed Bobby to be the key employee of the St. George warehouse companies, he wanted Bobby's approval of the sale, not because he felt Bobby was one of the owners but because he wanted Bobby to remain.

We are mindful of Bobby's statement "what would I do with all the money?" when Anthony discussed the proposed sale to O'Donnell. While that statement might be deemed to support respondent's position, we believe that it was made in the context that were the business to be sold, Bobby expected Anthony to give him a portion of the sale proceeds not because of any ownership interest Bobby had in the business but because of his familial relationship with Anthony and Anthony's history of providing for his family's welfare.

Ruse testified that although he had no personal knowledge as to the ownership structure of the St. George warehouse companies, he had no reason to doubt that Anthony was the sole owner. Ruse further stated that unusual ownership and operating arrangements can occur in closely held family companies:

> You have to understand, in selling private companies you see all sorts of very interesting ownership relationships in families. I was visiting a gentleman who was a former client last night whose daughter ran the business for years for him, who is now running it for the company that bought the business. She never had any ownership interest in the business, he got all the money from it. So I mean, it wasn't something I really dwelt upon.

Finally, respondent asserts that the reduction in fees that the St. George trucking companies (which were owned by Bobby)

charged to the St. George warehouses is evidence that Bobby had an ownership interest in the St. George warehouse companies. We disagree. The reduction in the shipping rates did not affect the viability of the trucking companies; and because of Bobby's generous compensation from the St. George warehouse companies, he did not depend on the St. George trucking companies for his livelihood. We believe Bobby reduced the shipping rates because (1) he intensely disliked paying taxes and (2) that dislike trumped everything else.

V. Conclusion

On the totality of the record we find as the ultimate fact that Bobby did not own a property interest in the St. George warehouse companies at the time of his death. Anthony and Bobby had an unusual arrangement by which both brothers prospered-- Anthony through the growth of the St. George warehouse companies; and Bobby through the compensation Anthony, as an absentee owner and devoted brother, was willing to give Bobby for his services. And that arrangement ended upon Bobby's death.

As a postscript, we do not fault respondent, in an attempt to protect the Federal fisc, for suspecting that Bobby had an ownership interest in the St. George warehouse companies at the time of his death. But we are unable to conclude that respondent's suspicion reflects reality.

To reflect concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.